Karen L. Martinez (Utah Bar No. 7914)
martinezk@sec.gov
Thomas M. Melton (Utah Bar No. 4999)
meltont@sec.gov
Jennifer Moore (New York Bar No. 3054301)
moorej@sec.gov
Paul Feindt (Utah Bar No. 8769)
feindtp@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
15 West South Temple, Suite 1800
Salt Lake City, Utah 84101
Telephone:    (801) 524-5796
Facsimile:    (801) 524-5262

Local Counsel:
Karen Matteson (Cal. Bar No. 102103)
mattesonk@sec.gov
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036-3648
Telephone:    (323) 965-3840
Facsimile:    (323) 965-3908

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | EDCV08-1350 VAP (OPx) |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| KEDERIO AINSWORTH, GUILLERMO HARO, JESUS GUTIERREZ, GABRIEL PAREDES, and ANGEL ROMO, | |
| Defendants. | |

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges as follows:

**JURISDICTION AND VENUE**

1.  This Court has jurisdiction over this action
    pursuant to Sections 20(b), 20(d)(1) and 22(a) of
    the Securities Act of 1933 ("Securities Act"), 15
    U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections
    21(d)(1), 21(d)(3)(A), 21(e) and 27 of the
    Securities Exchange Act of 1934 ("Exchange Act"),
    15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) &
    78aa. Defendants have, directly or indirectly,
    made use of the means or instrumentalities of
    interstate commerce, of the mails, or of the
    facilities of a national securities exchange, in
    connection with the transactions, acts, practices
    and courses of business alleged in this Complaint.

2.  Venue is proper in this district pursuant to
    Section 22(a) of the Securities Act, 15 U.S.C. §
    77v(a), and Section 27 of the Exchange Act, 15
    U.S.C. § 78aa, because certain of the transactions,
    acts, practices and courses of conduct constituting
    violations of the federal securities laws occurred
    within this district.

**SUMMARY**

3.  Throughout 2005 through 2007, defendants, five
    registered representatives affiliated with World
    Group Securities ("WGS"), a broker-dealer
    registered with the Commission, fraudulently sold

2

unsuitable securities, primarily variable universal life policies ("VUL"), financed through adjustable rate sub-prime mortgage refinancing.  The refinancing generated two sources of funds: short term savings in the difference between the old mortgage payment and the new mortgage payment, and equity removed from the investors' homes. Investors lacked the funds necessary to purchase the securities recommended by defendants absent the refinancing and lacked the funds necessary to continue to pay for the securities once their mortgage rates adjusted.  Most customers had little formal education beyond high school, were primarily lower-income, had little prior investment experience and many did not speak English fluently, if at all.

4.  Defendants used a mortgage company controlled by WGS registered representatives which operated from the same office location as WGS and was supervised by the WGS branch office manager to facilitate the refinancing necessary to allow customers to purchase securities defendants recommended.

5.  Defendants sold the refinancing and securities by misrepresenting the terms of the mortgages, misrepresenting the nature of the securities and recommending unsuitable investments to customers.

3

6. Based on this conduct defendants violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Defendants also aided and abetted WGS's violation of Section 17(a) of the Exchange Act and Rules 17a-3(a), 17a-3(a)(6) and 17a-3(a)(17) thereunder.

## DEFENDANTS AND RELATED ENTITIES

7. **World Group Securities, Inc. ("WGS")** is a Delaware corporation, headquartered in Duluth, Georgia. WGS has been registered as a broker-dealer with the Commission and a member of the Financial Industry Regulatory Authority ("FINRA") since January 23, 2002. WGS is subsidiary of AEGON Asset Management Services, Inc. which is owned by AEGON, NV, a diversified multinational insurance and financial services holding company based in the Netherlands. VULs and variable annuities make up approximately 90-95% of WGS' product sales. WGS has approximately 565 registered branch offices throughout the United States with around 5,600 registered representatives.

8. **World Financial Group ("WFG")** is a subsidiary of AEGON Asset Management Services, Inc. WFG acts as the marketing arm for WGS and is structured as a multi-level marketing company. Commissions are typically spread over multiple marketing levels

with registered representatives who are more senior
taking a larger percentage of commissions than
registered representatives who are more junior in
the marketing structure.  In order to become a WGS
registered representative, an individual must first
become a WFG associate.  Compensation relating to
securities sold through WGS is paid to the
registered representative through WFG.

9.  **AEGON, NV ("AEGON")** is a diversified multinational
insurance and financial services holding company
based in the Netherlands.  WGS is among a group of
affiliated companies under AEGON which also
includes WFG, Western Reserve Life Assurance of
Ohio ("WRL"), which issues VUL policies and
variable annuities, Innergy Lending, Inc., a
mortgage company, InterSecurities, Inc., a broker-
dealer registered with the Commission, and
Transamerica Asset Management, Inc., a registered
investment adviser.

10. **Ainsworth Financial Mortgage Corporation
("Ainsworth Mortgage")** is a mortgage company
headquartered in Rancho Cucamonga, California with
branch offices in Pomona, Ontario, and Long Beach,
California.  Ainsworth Mortgage was formed in
January 2004 and became a WFG Affiliate Broker in
March 2004.  In order to qualify as a WFG affiliate

broker, a company must agree to pay 25% of all commissions received to WFG.  WGS and WFG required that all mortgage business conducted by WFG associates to be conducted through an affiliate broker.

11. **Guillermo Haro ("Haro")**, a resident of Glendora, California, began working as a registered representative for WMA Securities, Inc. in April 1999 and became associated with WGS when it purchased WMA in 2002.  Haro became a WFG associate in June 2001 and is currently a senior vice chairman at WFG.  Haro is also a senior loan officer and branch manager of the Pomona Branch of Ainsworth Mortgage, which shares office space with WFG and WGS. During the period of time covered by this Complaint, Haro served as the branch manager of the WGS Pomona branch office.

12. **Kederio Ainsworth ("Ainsworth")**, of Fontana, California, is the branch manager of Ainsworth Mortgage's Rancho Cucamonga office.  He received a real estate license in 2001 and a real estate broker's license in 2003.  Ainsworth became a WFG associate in June 2002 and a registered representative affiliated with WGS in October 2002. He worked from the Rancho Cucamonga office of WGS.

13. **Jesus Gutierrez ("Gutierrez")** is a resident of

6

Downey, California.  He became a WFG associate in October 2003 and has been a WGS registered representative since February 2004 affiliated with the Pomona office.  Gutierrez is also a loan officer with Ainsworth Mortgage and supervises the City of Commerce, California office.

14. **Gabriel Paredes ("Paredes")** resides in Upland, California.  Paredes became a WFG associate in July 2004 and is a qualified marketing director with WFG.  Paredes became a registered representative affiliated with WGS in its Pomona office in October 2004.  Paredes is the branch manager of the Ainsworth Mortgage office in Ontario, California.

15. **Angel Romo ("Romo")** resides in Montebello, California.  Romo began working for WFG as an associate in March 2004 and joined WGS as a registered representative in May 2004.  Romo works from the City of Commerce office of WGS.  Romo is a qualified marketing director with WFG and a senior loan officer with Ainsworth Mortgage.

### BACKGROUND

16. Defendants fraudulently sold unsuitable securities to their customers financed by sub-prime mortgage refinancing.

17. Defendants solicited customers to refinance their homes through Ainsworth Mortgage into less than interest only adjustable rate mortgages.

7

Defendants recommended customers use the proceeds from the refinancing to purchase unsuitable securities.

18. Defendants knew or reasonably believed that the securities they recommended were unsuitable to the investors' needs and failed to disclose that fact to investors.

19. The refinancing was done to create a stream of available cash in the form of the difference between the old mortgage payment and the new, lower mortgage payment which could be invested in securities sold by WGS and would require monthly payments, primarily, in variable universal life policies ("VUL").

20. VUL policies are hybrid investments containing both securities and insurance features. VUL policies are life insurance policies that offer a death benefit to a designated beneficiary combined with an investment in the securities markets. Amounts paid into the VUL beyond the cost of insurance and fees are placed into sub-accounts that are invested into a range of securities funds. The sub-accounts are subject to market risk and build value based upon the performance of the customers' investment choices.

21. Defendants also induced customers to take equity out of their homes during the refinancing and

1    invest the cash into securities products, again
2    primarily VUL policies.

3    22.  Defendants Ainsworth, Gutierrez, Paredes, and Romo
4         falsified customer account forms, and all
5         defendants prepared order tickets that contained
6         information they knew was inaccurate.

7    23.  Investors lacked the funds necessary to purchase
8         the securities recommended by defendants absent the
9         refinancing.  Customers were unsophisticated and
10        had little understanding of the mortgage products
11        or securities sold to them.

12   24.  Most customers had little formal education beyond
13        high school, were primarily lower-income and had no
14        prior investment experience.  Some did not speak
15        English fluently, if at all.  Although some
16        defendants spoke Spanish, all paperwork for both
17        the securities transactions and the mortgage
18        transactions was printed in English.

19   25.  WGS required that the registered representatives
20        conduct any mortgage business through a WFG-
21        affiliated mortgage broker.  Ainsworth Mortgage was
22        the affiliated mortgage broker for the Pomona
23        office, and each refinance that is subject to this
24        Complaint was accomplished through Ainsworth
25        Mortgage.

26   26.  Ainsworth Mortgage is owned by Keysha Ainsworth,
27        Ainsworth's sister, and WGS registered

representatives controlled its operations. Ainsworth is the broker of record for Ainsworth Mortgage.  It operated from the same offices as WGS, and Haro supervised its Pomona operations.

27. Defendants marketed their services under the name WFG, promoting it as a full service financial company that enabled the same registered representative to service all the mortgage, insurance, and investment needs of his or her customers.  Defendants functioned as both the registered representative on the securities transactions as well as the loan officer on the mortgage refinancing that funded the securities purchases.

28. Defendants sold the mortgage products and securities by misrepresenting the terms of the mortgage, misrepresenting the nature of the securities product and recommending unsuitable investments to customers.

### STRUCTURE AND PAYOUT

29. All WGS registered representatives must first become associates of WFG.  In order to become a WFG associate, an individual must attend a recruiting meeting and pay a $199 fee.  After the fee is paid, the individual receives a WFG associate number which is then used to track any sales made by the individual.

30. Because WFG is structured in a similar fashion to a multi-level-marketing company, when a WFG associate or WGS registered representative recruits an associate, that recruit is placed in the recruiting associate's "downline." A portion of revenue generated by any WFG associate is shared with his "upline" hierarchy. An associate's level of compensation and his promotion is impacted by points generated by both himself and anyone in his downline.

31. WFG associates receive points for any commissions earned for sales of financial products including mortgage originations; WFG associates who are also WGS registered representatives receive WFG points for any commissions they generate from sales of securities, such as VULs, effected through WGS. The points earned correspond to the dollar amount of the commission received for any given product. Mortgages and VUL sales generate the highest commissions and therefore the most points.

32. Western Reserve Life ("WRL") pays WGS a commission of 108.08% of the first year premiums from a VUL policy. This amount is then paid to registered representatives and their hierarchy based on the registered representatives' payout rate.

33. Payout rates begin at 25% and increase to 65%, depending on the registered representatives' WFG

11

title.   Points earned from sales of mortgages, insurance products or securities are used to determine promotions throughout the WFG multi-level marketing hierarchy; any promotion will increase the associates' payout rate both for sales of non-securities products through WFG and for securities business done through WGS.   WRL was the underwriter on all VULs sold by defendants that are the subject of this Complaint.

34.  In order for a WFG associate or WGS registered representative to earn points for mortgage business, WFG and WGS required the use of an approved mortgage broker which is part of the affiliate broker program.

35.  In order to qualify as an affiliate broker and therefore be approved by WGS, the mortgage company must agree to pay WFG 25% of all commissionable revenue.   Commissionable revenue consists of origination fees, yield spread premiums, and loan discount fees retained.   Of the remaining 75% of the commissionable revenue, the registered representative would receive 50% and the affiliated broker would keep 25%.

36.  In March 2004, Ainsworth Mortgage became an approved WGS/WFG affiliate broker.   As such, Ainsworth Mortgage paid 25% of its commissionable revenue to WFG in exchange for the origination of

any mortgages by WFG associates and WGS registered representatives.

37. All WGS registered representatives and WFG associates in Pomona were required by WGS to use Ainsworth Mortgage for any mortgage activity. Ainsworth Mortgage reported all commissions earned by WFG associates and WGS registered representatives to WFG.  Each refinance that is subject to this Complaint was conducted through Ainsworth Mortgage.

38. WFG assigned points to each WFG associate or WGS registered representative based on the revenue generated.  The points that a WGS registered representative received from WFG affected the payout rate to the registered representative on commissions from sales of securities products; thus the more mortgages a representative sold, the higher his commission payout on sales of securities.

### HARO TRAINS REGISTERED REPRESENTATIVES TO RECOMMEND UNSUITABLE SECURITIES

39. Haro was the branch office manager of the Pomona, California WGS branch office and served in that capacity until May 2007.

40. Haro trained new WFG associates by taking them into the field with him for customer appointments and sales presentations.  Although not yet registered representatives, the new associates accompanied

13

Haro to learn how to present products and services to customers.

41. Haro trained both WGS registered representatives and WFG associates who worked in the Pomona office to recommend that their customers purchase securities with the purchase funded through refinancing their home mortgages.

42. Haro trained registered representatives in the Pomona branch office that there were two methods of obtaining funds to invest through a refinance, (1) the customer could refinance his mortgage to an interest-only or negative amortization loan, taking cash out through the refinancing which could be used to buy securities or (2) the customer could refinance his mortgage to an interest only or a negative amortization loan, thereby reducing his monthly payment, and use the monthly savings to make monthly payments on securities. In both situations, the customer would use cash generated by refinancing a mortgage to fund securities purchases, the only difference being whether a customer purchased a front-loaded securities purchase or made a monthly payment toward the purchase of securities.

43. While serving as branch office manager for WGS, Haro was solely responsible for the supervision of between 220 and 250 WGS registered representatives

14

in the Pomona office. His supervisory duties included reviewing and approving all securities transactions for suitability.  In addition to supervising WGS employees, Haro supervised another 100 to 200 WFG associates in Pomona.  He was responsible, in large part, for training new WFG associates and running the twice weekly meetings all WFG associates were required to attend.

44. Haro also acted as the branch manager of Ainsworth Mortgage's Pomona office during the period of the conduct described herein and in that capacity reviewed and approved all mortgage transactions for all loan officers in Pomona.

### DEFENDANTS RECOMMEND UNSUITABLE SECURITIES TO CUSTOMERS

45. Defendants recommended negative amortization loans to their customers for the purported purpose of increasing the amount of customers' discretionary income. Defendants placed customers in negative amortization loans with adjustable interest rates that could reset from the low introductory rate after only a month.  After a short period of time, customers frequently saw their mortgage payment increase substantially.

46. The customers were often not aware that the interest rate on their new loans was adjustable. When the payments increased and the customer

attempted to refinance into a lower rate, the
customer learned that he or she would incur
significant prepayment penalties.  In most
circumstances, customers had to hold the mortgage
for three years to avoid the prepayment penalty.
Customers had not been told about the prepayment
penalty in most situations.

47. In the situations where the customer made the
minimum mortgage payment, the monthly payment on
the mortgage was not enough to cover the monthly
interest charges.  Consequently, customers
eventually learned that, despite making monthly
payments, their principal balance increased each
month.  In effect, customers were effectively
withdrawing home equity on a monthly basis to
purchase securities recommended by defendants.
Where customers took a lump sum of cash from their
refinancing, the customers used home equity to
purchase securities recommended by defendants.

48. Defendants told customers that by lowering their
monthly mortgage payments, they would increase
discretionary monthly income to invest.  Defendants
claimed that by investing in a VUL, customers would
earn interest, rather than using the money to pay
the principal on their mortgages, which would only
benefit the bank or mortgage company.

49. By investing in a VUL, defendants claimed the

16

customer's money would work for him rather than for the bank. Defendants then advised the customers to purchase VULs, which were falsely represented as generating a 12% annual return.

50. VUL policies are considered long-term investments due to the amount of time it takes to build cash value. Because VUL policies also impose substantial surrender charges, a VUL policy surrendered in the first ten years after purchase would be unlikely to have sufficient surrender value to allow the customer to break-even.

51. The risk that the investor will need to surrender the policy greatly increases if he or she uses the monthly savings from refinancing a mortgage through an adjustable rate loan to fund the VUL. The negative amortization adjustable rate mortgages taken out by WGS customers have interest rates that can be adjusted after one month. Defendants knew or were reckless in not knowing that the customers' mortgage payments would increase.

52. Defendants knew or were reckless in not knowing that any increase in the mortgage payments would impact the ability of the mortgagor to make the payments on his or her VUL policy. If the interest rate on the mortgage adjusts upward, the investor will lose the savings in his or her mortgage payment that were used to fund the purchase of the

VUL, thereby increasing the likelihood he or she
will need to surrender the VUL.  Defendants failed
to disclose this risk to customers.

53. Once the mortgage rate adjusted upward, the
customers described in detail below could no longer
afford the payments on the VULs and, as a result
their policies lapsed and the individuals lost
their investment.

54. Defendants also failed to explain to customers the
surrender fees and the fees relating to the VULs at
the time the VULs were sold.  The complexity of VUL
products makes it difficult for investors to
estimate the costs of insurance and other
administrative charges.  The disclosures of those
costs and fees were inadequate to allow an
unsophisticated investor, such as defendants'
customers, to know what level of premium is
necessary to keep the policy in effect over time.

55. The sales commissions on a VUL are substantially
higher than the commissions earned on a mutual fund
or term life insurance policy, which in turn
generated higher commissions for defendants.

56. Although defendants provided customers with a
prospectus, defendants' affirmative
misrepresentations combined with the customers lack
of sophistication prevented the customer from
understanding the nature of the product sold and

the fees and risks associated with such a product.

57. Defendants frequently misrepresented the substance of a VUL to customers by describing it as a savings plan, a retirement plan, or a college savings plan. Such descriptions are misleading when the explanation excludes the fact that the VUL is first a long-term whole life insurance product requiring premium payments for roughly ten years in order to build cash value.

58. The VUL was not suitable for defendants' customers. It did not  match the investors' objectives.  The net worth and income of the customers did not warrant the purchase of the VUL, in light of the relatively high insurance costs and fees generated by the VUL.

59. WGS' Written Supervisory Procedures state that a registered representative "may not recommend to a client that he take out a policy loan, home equity line of credit, or any other loan to pay for a securities purchase."

60. Defendants did not disclose to investors that their recommendations to refinance and use borrowed funds to purchase VULs were contrary to WGS' Written Supervisory Procedures.

61. In addition to the investors described in detail below, defendants recommended refinancing and using the proceeds from the refinancing to purchase

19

unsuitable VULs to approximately 28 other
individuals.

**GUILLERMO HARO**

**Investor Maria Herrera**

62. In or about October 2006, Haro met with investor
Maria Herrera ("Herrera"). Herrera is 62 and lives
in Moreno Valley, California. Herrera is married
with three adult children. Herrera is not
employed. Her husband, Alfonso, works in the
shipping and receiving department of a company
called Valspar. Herrera and her husband have a
fifth and sixth grade education, respectively, from
Mexico. Neither speaks English. Herrera has no
investment experience, no life insurance, and no
assets other than her home. Herrera provided her
financial information to Haro.

63. Haro encouraged Herrera to refinance her home and
use the proceeds to purchase a VUL. Herrera closed
her mortgage loan on October 30, 2006, and received
a check for $26,226 for the equity she removed.
Haro did not tell Herrera that he placed Herrera in
a negative amortization loan, and that by making
the minimum monthly payment, her loan balance would
increase every month.

64. On November 5, 2006, Herrera purchased a VUL,
naming both her and her husband as insured.
Herrera made an initial payment of $2,000, with

20

monthly premium payments to be $450. Haro completed the Client Account Form and told Herrera that she would be saving $700 per month in different investments. Haro did not explain what any of those investments were.

65. Herrera did not understand what a VUL was, nor its purpose. Based on representations by Haro, Herrera believed she was contributing $450 per month for life insurance, $150 for marketing, which she believes is similar to savings based on what Haro told her, and $100 per month for stocks.

66. Haro did not disclose to Herrera that her VUL had monthly fees and expenses.

67. The VUL was not a suitable investment for Herrera. Haro had no basis to reasonably believe that the VUL was suitable based on Herrera's financial needs, objectives, and circumstances.

68. Haro knew or reasonably believed the VUL was unsuited to Herrera's needs and failed to disclose this fact to Herrera.

69. Haro told Herrera that her "savings" would always earn 12% and could not decrease in value. That statement is false.

70. Haro's misrepresentations and omissions regarding the refinances and the VUL were material.

71. Haro's misrepresentations and omissions regarding the refinances and the VUL were made with scienter.

**Investor Cynthia Parker**

72. In or around April or early May 2006, Haro met with investor Cynthia Parker ("Parker"). Parker is 34 years old and lives in Corona, California. Parker is married with two children. Parker is a real estate agent with Prudential Realty. She has no education beyond high school. Her only investment experience is a 401(k) account with her employer. Parker does not own life insurance, but her husband has life insurance through his job with the L.A. County Sheriff's Department. Parker provided her financial information to Haro.

73. Haro recommended that the Parkers increase their life insurance and open a savings account for their young son that could be used at age eighteen for his college education. Parker understood the recommendation regarding her son to be a type of college savings plan investment with life insurance included. Haro also recommended that Parker refinance her house and pull out home equity to invest. Parker did not refinance her home.

74. On May 3, 2006, Parker purchased three VULs: one for herself, one for her husband, and one for her two-year-old son. The face value of the VUL for Parker's son was $250,000, with a monthly premium of $100.

75. The VULs were not suitable investments for Parker.

22

Haro had no basis to reasonably believe that the VULs were suitable based on Parker's financial needs, objectives, and circumstances.

76. Haro knew or reasonably believed that the VUL was unsuited to Parker's needs and failed to disclose this fact to Parker.

77. Haro did not disclose the monthly fees and expenses of the VUL to Parker. Haro also failed to disclose the monthly cost of insurance. Parker believed that the full $100 she placed in her son's account was being invested. Parker first discovered the fees, expenses, and cost of insurance when she received her year-end statement.

78. Haro also told Parker that her investment could not decrease in value. That statement is false.

79. Haro's misrepresentations and omissions regarding the VUL were material.

80. Haro's misrepresentations and omissions regarding the VUL were made with scienter.

**KEDERIO AINSWORTH**

**Investor Desiray Johnson**

81. During the summer of 2006, Ainsworth met with investor Desiray Johnson ("Johnson"). Johnson is 53 years old and lives in Rialto, California. Johnson is employed by Job Corps Inland Empire to assist children in developing life skills. Johnson also works at Dee Dee's Discount Clothing Store,

23

and runs her own catering business. Johnson is married with one minor child and one adult child. Her husband is a senior window washer for the Los Angeles Unified School District. Johnson has an associate's degree in business administration and a certified nursing assistant license. Johnson has a $100,000 life insurance policy through Job Corps Inland Empire and a 401(k) plan. Her husband also has life insurance through work and contributes to the California Public Employees' Retirement System (CalPERS). Johnson provided her financial information to Ainsworth.

82. Ainsworth told Johnson he could help her with her mortgage by lowering her interest rate through a refinance. At the time, Johnson had a fixed rate mortgage with an interest rate of approximately 10%. Johnson followed Ainsworth's advice and refinanced her mortgage on January 24, 2006.

83. On March 16, 2006, Johnson purchased a VUL from Ainsworth using the cash available resulting from her refinance which resulted in a lower mortgage payment for Johnson. Based on representations by Ainsworth, Johnson believes she purchased a term life insurance policy from Ainsworth. Johnson in fact purchased a VUL from Ainsworth.

84. The VUL was not a suitable investment for Johnson. Ainsworth had no basis to reasonably believe that

24

the VUL was suitable based on Johnson's financial needs, objectives, and circumstances.

85. Ainsworth knew or reasonably believed that the VUL was unsuited to Johnson's needs and failed to disclose this fact to Johnson.

86. When Johnson met with Ainsworth to sign the paperwork for her VUL, Ainsworth requested that Johnson sign a blank WGS Client Account Form. Ainsworth told Johnson that he would meet with her at a later date to explain the documents. Ainsworth never met with Johnson after she signed the paperwork for the refinance and the VUL.

87. Ainsworth filled out both the risk profile and financial profile section of the WGS Client Account Form with inaccurate information without discussing those items with Johnson.

88. Ainsworth did not disclose to Johnson that her VUL had investment sub-accounts.  Ainsworth never disclosed to Johnson her account could decrease in value.

89. Ainsworth never explained to Johnson that she was placed in a negative amortization loan or that by making the less than interest only payment on her mortgage, Johnson's principal balance would increase each month.  Johnson believed her monthly mortgage payment included both principal and interest.

90. Ainsworth's misrepresentations and omissions regarding the VUL and refinances were material.

91. Ainsworth's misrepresentations and omissions regarding the VUL and refinances were made with scienter.

**Investor Juan Carlos Cisneros**

92. In or around June 2006, Ainsworth met with investor Juan Carlos Cisneros ("Cisneros"). Cisneros is 43 years old and lives in Bell Gardens, California. He is married with three children. Cisneros is a mechanic, and owner of a 99 Cent Store. Cisneros was educated through the equivalent of junior high in Mexico. Cisneros does not have a retirement account, insurance, or any investment experience. He is a native Spanish speaker and speaks virtually no English. Cisneros provided his financial information to Ainsworth.

93. Ainsworth recommended Cisneros refinance his mortgage. Although Cisneros understood very little of what Ainsworth told him, Cisneros closed his refinance on June 5, 2006, removing $77,286 of equity from his home.

94. Based on what he was told by Ainsworth, Cisneros believed he was getting a fixed rate mortgage. Ainsworth did not disclose to Cisneros he had been placed in a negative amortization adjustable rate mortgage and that by making the minimum payment his

outstanding balance would increase every month. Cisneros believed that his monthly payment would cover both principal and interest. Ainsworth also failed to disclose that the mortgage loan had a prepayment penalty.

95. On July 6, 2006, on Ainsworth's recommendation Cisneros purchased a VUL. Cisneros did not understand what he had purchased from Ainsworth other than it was a form of life insurance.

96. The VUL was not a suitable investment for Cisneros. Ainsworth had no basis to reasonably believe that the VUL was suitable based on Cisneros' financial needs, objectives, and circumstances.

97. Ainsworth knew or reasonably believed that the VUL was unsuited to Cisneros' needs and failed to disclose that fact to Cisneros.

98. Ainsworth's misrepresentations and omissions regarding the refinancing and VUL were material.

99. Ainsworth's misrepresentations and omissions regarding the refinancing and VUL were made with scienter.

**Investor Rogelio Alvarado**

100. In early 2007, Ainsworth met with investor Rogelio Alvarado ("Alvarado"). Alvarado is 48 years old and lives in Fontana, California. He is married with two children ages 16 and 24. Alvarado works in the construction industry, moving between jobs

frequently.   Alvarado and his wife received education through the sixth grade in Mexico. Alvarado does not have any investment experience. Alvarado's income was roughly $4,800 per month at the time he met with Ainsworth.   Alvarado provided his financial information to Ainsworth.

101. Ainsworth recommended that Alvarado remove $20,000 of his home equity and purchase a mutual fund and a VUL.   On February 15, 2007, Alvarado purchased a WRL Freedom Elite Builder II VUL with an initial investment of $10,250.

102. Ainsworth told Alvarado he could pay the next couple of year's $10,250 premium for the VUL with the savings from the lower monthly payment on his house by refinancing into the Option ARM.   Based on Ainsworth's recommendation, Alvarado refinanced his mortgage.

103. Ainsworth explained to Alvarado that the VUL is like a savings account that would earn a higher interest rate, and after a couple of years the policy would make enough money to pay for itself. This information is false and misleading.

104. The VUL was not a suitable investment for Alvarado. Ainsworth had no basis to reasonably believe that the VUL was suitable based on Alvarado's financial needs, objectives, and circumstances.

105. Ainsworth knew or reasonably believed that the VUL

was unsuited to Alvarado's needs and failed to
disclose that fact to Cisneros.

106. Ainsworth's misrepresentations and omissions
regarding the refinancing and VUL were material.

107. Ainsworth's misrepresentations and omissions
regarding the refinancing and VUL were made with
scienter.

108. Ainsworth completed Alvarado's Client Account Form
with inaccurate information.  The Client Account
Form lists $2,000 per month of discretionary
income.  The information is not correct.

**JESUS GUTIERREZ**

**Investor Abel Renteria**

109. In or about March 2006, defendant Gutierrez met
with investor Abel Renteria ("Renteria").  Renteria
is 36 years old and lives in Whittier, California.
Renteria is married with three children.  Renteria
is a grocery store warehouse supervisor.  His wife
is a special education assistant with the Los
Angeles Unified School District.  Renteria has a
high school diploma and attended two years of
college.  His investment experience consists of his
401(k) account through work, and a $250 account
with ING.  Renteria has a $10,000 term life
insurance policy through work with the ability to
increase the face amount for a small fee.  Renteria
also owned a $250,000 whole life policy at the time

29

he met with Gutierrez which he later surrendered after purchasing a VUL on Gutierrez's recommendation. Renteria provided his financial information to Gutierrez.

110. Gutierrez recommended that Renteria refinance his home because Renteria wasn't making any money on his mortgage. Gutierrez explained that by lowering his monthly mortgage payment, Renteria would have money to invest. Renteria had a 30-year fixed rate mortgage with a monthly payment of $2,400. Gutierrez explained to Renteria that through Gutierrez and WFG, he would have all his financial needs met, from mortgage to insurance and investments.

111. Gutierrez recommended a 1% mortgage loan, which would lower Renteria's payment to $1,600. Renteria closed his mortgage refinance on March 22, 2006, removing $11,551 in equity.

112. Gutierrez did not disclose to Renteria that his new mortgage was a negative amortization adjustable rate loan or that by making the minimum payment his outstanding balance would increase every month. Renteria believed his monthly payment included both principal and interest.

113. Gutierrez told Renteria to wait until after the refinance to purchase investment products because the refinance would free up money to invest, both

from the equity removed and the lower monthly
payments. Gutierrez recommended that Renteria
invest the entire $800 per month savings on his
mortgage payment with WGS, plus "front-load" the
VUL from the cash-out equity.

114. During his presentation on the VUL, Gutierrez told
Renteria that he would earn a 12% return.  That
statement is false.

115. On March 30, 2006, Renteria purchased three VUL's
and a mutual fund from Gutierrez.  Gutierrez
recommended a VUL with a face amount of $125,000
and a monthly premium payment of $100 for
Renteria's one year-old daughter, a VUL with a
death benefit of $250,000 and monthly premium
payment of $300 for Renteria's wife, and a VUL for
Renteria with a death benefit of $500,000 and a
monthly premium payment of $500.  At the
recommendation of Gutierrez, Renteria "front-
loaded" both his and his wife's VULs with $2,500
each with the proceeds from the cash-out refinance.

116. The VUL was not a suitable investment for Renteria.
Gutierrez had no basis to reasonably believe that
the VUL was suitable based on Renteria's financial
needs, objectives, and circumstances.

117. Gutierrez knew or reasonably believed that the VUL
was unsuited to Renteria's needs and failed to
disclose this fact to Renteria.

118. Gutierrez did not disclose to Renteria the monthly fees and expenses on either the VUL's or the mutual fund. Gutierrez failed to disclose that the VUL policies contained surrender charges. Gutierrez never disclosed the monthly cost of insurance in the VULs.

119. Gutierrez's misrepresentations and omissions regarding the VUL and the refinancing were material.

120. Gutierrez's misrepresentations and omissions regarding the VUL and the refinancing were made with scienter.

121. Renteria did not complete the WGS Client Account Form. Renteria is entirely unfamiliar with the terms "liquid net worth" or "discretionary income". Gutierrez completed Renteria's Client Account Form with false information. The $10,000 indicated as "Liquid Net Worth" on the Client Account Form is the $10,000 cash back Renteria received from his refinance.

122. Renteria was not involved in calculating the numbers that were inserted into the "Financial Profile" on the Client Account Form. Although Renteria told Gutierrez that before he refinanced, he had about $300 left over after paying his bills, and then would have another $800 per month after the refinance, this amount is still far less than

the $1,600 Gutierrez entered on the Client Account Form as Renteria's discretionary monthly income.

**Investor Hermalinda Luna**

123. In or about December 2006, Gutierrez met with investor Hermalinda Luna ("Luna"). Luna is 37 years old and lives in Norwalk, California. Luna is single with no dependents. Luna is employed as director of student services, counseling at St. Francis Medical Center, and a medical social worker at White Memorial Medical Center. She has a bachelor's and master's degree in social work from California State Long Beach. Luna's investment experience includes an IRA account that she transferred to WGS. Luna provided her financial information to Gutierrez.

124. Gutierrez recommended Luna refinance her home and use home equity to purchase securities. Luna followed Gutierrez's advice and refinanced her home in order to have money to invest. On December 11, 2006, Luna closed her mortgage loan, withdrawing $79,431 in home equity.

125. Gutierrez did not disclose to Luna that her new mortgage was a negative amortization loan or that by making the minimum payment her outstanding balance would increase every month.

126. After the refinance was complete, Luna grew concerned about her increasing mortgage balance

and approached Gutierrez with that concern.
Gutierrez told Luna that the purpose of her
investment was to use the investment proceeds to
payoff her mortgage in the future.

127. Gutierrez recommended Luna purchase a VUL in the
amount of $9,500.  Luna used proceeds from her
refinance to "front-load" her VUL.  Her monthly
premiums for the policy are $400, and the death
benefit is $500,000.

128. The VUL was not a suitable investment for Luna.
Gutierrez had no basis to reasonably believe that
the VUL was suitable based on Luna's financial
needs, objectives, and circumstances.

129. Gutierrez knew or reasonably believed that the VUL
was unsuited to Luna and failed to disclose this
fact to Luna.

130. The misrepresentations and omissions Gutierrez made
regarding the refinance and VUL were material.

131. Gutierrez made the misrepresentations and omissions
regarding the refinance and VUL with scienter.

**Investor Moises Aguirre**

132. In November 2006, Gutierrez met with investor
Moises Aguirre ("Aguirre").  Aguirre is 35 years
old and lives in Los Angeles, California.  He is
single with two young children.  Aguirre is
employed by the United States Postal Service as a
letter carrier.  Aguirre has no formal education

34

beyond high school.  His investment experience is limited to his Thrift Savings Plan and an American Funds mutual fund.  Aguirre provided his financial information to Gutierrez.

133.  Aguirre approached Gutierrez to request assistance in refinancing his home as Aguirre was going through a divorce.  Aguirre wanted to remove his ex-wife from the title, and also remove his ex-wife's portion of the home equity.  Gutierrez told Aguirre he could help him because his firm, WFG, did both mortgages and investments.

134. Gutierrez placed Aguirre in a negative amortization loan so that Aguirre could lower his monthly payment, and therefore, have funds available to invest with WGS each month.  Gutierrez also recommended that Aguirre use equity from his home to invest with WGS.

135. Gutierrez did not disclose to Aguirre that by making the minimum monthly payment, his principal mortgage balance would actually increase each month.  Gutierrez also failed to disclose that Aguirre's interest rate and monthly mortgage payment could increase.  Finally, Gutierrez never told Aguirre that the mortgage was subject to a prepayment penalty.

136. Based on Gutierrez's recommendations, Aguirre invested $3,700 of the proceeds of his cash-out

35

refinance in a VUL.

137. The VUL was not a suitable investment for Aguirre. Gutierrez had no basis to reasonably believe that the VUL was suitable based on Aguirre's financial needs, objectives, and circumstances.

138. Gutierrez knew or reasonably believed the VUL was unsuited to Aguirrre's needs and failed to disclose this fact to Aguirre.

139. Gutierrez did not disclose to Aguirre the surrender charges, or monthly expenses, associated with the VUL.

140. Gutierrez's misrepresentations and omissions regarding the refinance and the VUL were material.

141. Gutierrez's misrepresentations and omissions regarding the refinance and the VUL were made with scienter.

142. Gutierrez completed the Risk Profile and Financial Profile sections of the Client Account Form on Aguirre's behalf. Gutierrez instructed Aguirre to sign the form without explaining either section to Aguirre. Gutierrez overstated both Aguirre's net worth and discretionary income on the client account form.

**GABRIEL PAREDES**

**Investor Lorenzo Pelayo**

143. In or about February 2006, defendant Paredes met with investor Lorenzo Pelayo ("Pelayo"). Pelayo is

41 years old and lives in San Bernardino, California.  Pelayo is married with four minor children aged 9, 7, 5, and 4.  Pelayo has lived in the United States for 10 years and is employed as a truck driver.  Pelayo's wife, Elsa, is employed cleaning truck trailers.  Both of the Pelayo's graduated from high school in Mexico, and have no further education.  Pelayo speaks English haltingly.  Pelayo has no investment experience. For the year ending 2006 the Pelayo family earned a combined income of $15,000, and roughly $35,000 in 2007.  Pelayo provided his financial information to Paredes.

144. Paredes met with Pelayo, and recommended Pelayo refinance his mortgage and use home equity to invest in a VUL.  Paredes suggested a 1.675% negative amortization adjustable rate loan to keep Pelayo's monthly mortgage payments as low as possible so that Pelayo would have funds to invest each month.  Pelayo believed his mortgage loan would remain at a 1.675% interest rate and his monthly payments would remain the same for the thirty-year term.  On March 22, 2006, Pelayo refinanced his mortgage, removing $55,972 in equity from his home.

145. Paredes did not disclose to Pelayo that his new mortgage was a negative amortization adjustable

rate loan, and therefore, despite making monthly payments, the principal balance would continue to increase. Pelayo was not told that his mortgage interest rate could increase. Paredes did not disclose that Pelayo's mortgage loan had a prepayment penalty.

146. Paredes recommended that Pelayo purchase five VULs: a joint policy for him and his wife, and a policy for each of his young children with the proceeds of his cash equity. On March 28, 2006, Pelayo paid $9,000 to front load the VULs with the funds received from the refinance of his mortgage. The monthly premium payments of approximately $500 are more than Pelayo can afford, and were paid with the funds from the refinance. The annual premiums on the VUL policies comprised more than 1/3 the total net income of the Pelayo family for 2006.

147. The VUL was not a suitable investment for Pelayo. Paredes had no basis to reasonably believe that the VUL was suitable based on Pelayo's financial needs, objectives, and circumstances.

148. Paredes' misrepresentations and omissions regarding the refinance and VUL were material.

149. Paredes' misrepresentations and omissions regarding the refinance and VUL were made with scienter.

**Investor Christina Cervantes**

150. Paredes and two associates met with investor

Christina Cervantes ("Cervantes") in or about April
or May 2006.  Cervantes lives in Whittier,
California.  Cervantes is 63 and single with two
granddaughters who reside with her.  Cervantes is
an operations assistant with the Los Angeles County
Sheriff's Department.  Cervantes participates in a
401(k) account and has a Horizons Group retirement
account.  Cervantes provided her financial
information to Paredes.

151. Paredes and his associates came to Cervantes' house
to discuss insurance.  The only type of insurance
Paredes recommended or discussed was variable
universal life.  Paredes told Cervantes she could
not lose  money because her investment in the VUL
would double every 7 years. Cervantes purchased
three VULs: one for her 35-year-old daughter, one
for her 12-year-old granddaughter, and one for her
3-year-old granddaughter.

152. The VUL was not a suitable investment for
Cervantes.  Paredes had no basis to reasonably
believe that the VUL was suitable based on
Cervantes' financial needs, objectives, and
circumstances.

153. Paredes knew or reasonably believed the VUL was
unsuited to Cervantes' needs and failed to disclose
this fact to Cervantes.

154. Paredes did not disclose to Cervantes that there

were monthly fees, surrender charges, or expenses associated with the VUL. Cervantes believed the entire $285 she paid each month on behalf of her daughter and granddaughters was being invested.

155. Paredes failed to disclose any risks or that Cervantes' investment could decrease in value. Paredes simply emphasized that the VULs would double in value every seven years.

156. Paredes' misrepresentations and omissions regarding the VUL were material.

157. Paredes made the misrepresentations and omissions regarding the VUL with scienter.

**Investor Sandra Chavez**

158. In or around November 2006, Paredes met with investor Sandra Chavez ("Chavez"). Chavez resides in Highland Park, California. She is married with four children. Chavez is an independent distributor for Herbalife International, her husband, Fredy, works in the construction industry. Chavez completed 12 years of education in Guatemala and earned a GED when she came to the U.S. Chavez has no investment experience outside of WGS. Chavez does not own life insurance. Chavez provided her financial information to Paredes.

159. On November 6, 2006, Chavez refinanced her mortgage with Paredes into an option ARM. Her loan amount was $360,000. Prior to the refinance, Chavez had a

30 year fixed rate mortgage at 8.5% with a monthly payment of roughly $1,200 including taxes and insurance.

160. Paredes recommended that Chavez use $50,000 of home equity to purchase a variable annuity, and $50,000 to purchase a money market account. Both purchases took place on January 15, 2007. Paredes also sold Chavez four equity indexed universal life policies.

161. The variable annuity was not a suitable investment for Chavez. Paredes had no basis to reasonably believe that the variable annuity was suitable based on Chavez' financial needs, objectives, and circumstances.

162. Paredes did not disclose any risks associated with the variable annuity and told Chavez the variable annuity could not decrease in value.

163. Paredes knew or reasonably believed the variable annuity was unsuited to Chavez' needs and failed to disclose this fact to Chavez.

164. Paredes' misrepresentations and omissions regarding the variable annuity were material.

165. Paredes made the misrepresentations and omissions regarding the variable annuity with scienter.

166. Paredes filled out Chavez's Client Account Form with inaccurate information. The annual income listed on the account form is $80,000 for Fredy and

41

$25,000 for Chavez.  Fredy's income was between
$25,000 and $30,000 for 2006 and 2007.  Chavez had
no income during that time.  The Client Account
Form lists $2,000 monthly discretionary income for
Fredy and $500 for Chavez.  This amount is more
than their total income for the year.

**ANGEL ROMO**

**Investor Yvette Madrid**

167. In or around early April 2006, Romo met with
investor Yvette Madrid ("Madrid").  Madrid is 45
years old and resides in Los Angeles, California.
Madrid is single with three grown children who live
with her.  Madrid is employed by the Los Angeles
Unified School District as a bus driver.  Madrid
earned a GED and has no further education.  Her
only investment experience is her contribution to a
retirement plan through work.  Madrid has a term
life insurance policy in the amount of $20,000
through her employer.  Madrid provided her
financial information to Romo.

168. On April 3, 2006,  Madrid purchased a VUL from Romo
with a death benefit of $250,000 and a monthly
premium payment of $250.

169. The VUL was not a suitable investment for Madrid.
Romo had no basis to reasonably believe that the
VUL was suitable based on Madrid's financial needs,
objectives, and circumstances.

42

170. Romo knew or reasonably believed that the VUL was unsuited to Madrid's needs and failed to disclose this to Madrid.

171. Madrid also met with Romo regarding refinancing her home.  Madrid closed her loan on May 3, 2006, taking out $14,725 of home equity.

172. Romo recommended that Madrid use the savings in her monthly payment as a result of using an option ARM to invest.  Romo did not disclose to Madrid that by making the minimum payment, her mortgage balance would increase each month.

173. Romo's misrepresentations and omissions regarding the refinance and the VUL were material.

174. Romo made the misrepresentations and omissions regarding the refinance and the VUL with scienter.

175. Although Madrid signed the WGS Client Account Form, Romo completed Madrid's Client Account Form without consulting with Madrid.  Madrid's Client Account Form describes her investment objective as aggressive growth; however, Madrid's objective was growth and income.  Madrid's Client Account Form also describes her risk tolerance as 50% high risk, 50% speculative; however, Madrid's stated risk tolerance was low.  Madrid's Client Account Form also overstated her net worth, liquid net worth and discretionary income.

**Investor Calandra Moore**

176. In or about July 2006, Romo met with investor Calandra Moore ("Moore").  Moore is 38 years old and resides in Fontana, California.  She is single with two children ages 12 and 13.  Moore is a graduate of UCLA and  school psychologist for the Los Angeles Unified School District.  Moore contributes to her 403(b) plan at work and has an IRA account.  Moore has a term life policy through Liberty Mutual with a death benefit of $500,000, for which she paid roughly $48 per month.  Her children have riders on the term policy for $10,000 each.  Moore provided her financial information to Romo.

177. Romo recommended Moore refinance her mortgage with an Option ARM.  Romo told Moore that the new, lower interest rate wouldn't adjust for five years. Based on Romo's representations, Moore understood her payment would stay the same for five years and that she would be paying both principal and interest when making the minimum payment.

178. Romo did not tell Moore that by making the minimum payment her outstanding principal balance would increase.

179. Moore closed her loan with Romo on July 21, 2006 removing $18,610 of equity.

180. Romo recommended that Moore use part of the equity

44

removed with the refinancing of her mortgage to invest with WGS.

181. Moore purchased three WRL Freedom Elite Builder VUL's from Romo on August 11, 2006, two policies for her children with initial investments of $1,200 each, and another for herself with an initial investment of $4,200.

182. Romo did not disclose the surrender charges associated with the VULs. Romo also told Moore she could withdraw money from the policies if she needed to, and did not tell her there would be penalties for doing so.

183. Romo failed to disclose the fees and expenses associate with the VUL. Moore believed that 100% of her premiums were being invested and, based on Romo's representations, thought the investment would make 8% per year.

184. Moore made the payments on the VUL using her increased income resulting from the difference between her old mortgage payment and the payment after refinancing. After the interest rate on her new loan adjusted, Moore could not continue to make the VUL payments because she lacked the necessary discretionary income.

185. The VUL was not a suitable investment for Moore. Romo had no basis to reasonably believe that the VUL was suitable based on Moore's financial needs,

objectives, and circumstances.

186. Romo knew or reasonably believed that the VUL was unsuited to Moore's needs and failed to disclose this to Moore.

187. Romo's misrepresentations and omissions regarding the refinance and the VUL were material.

188. Romo made the misrepresentations and omissions regarding the refinance and the VUL with scienter.

189. Romo filed out Moore's Client Account Form with inaccurate information.  Moore does not have a net worth of $35,000.  She does not have $800 of discretionary income each month.

**Investor Cesar Torres**

190. During 2005, Romo met with investor Cesar Torres ("Torres").  Torres resides in Montebello, California and is married with a four-year-old child.  Torres is employed by the Los Angeles Unified School District as a bus driver.  He completed high school and one year of community college.  His only investment experience has been a retirement account through the school district.  Torres has a $50,000 life insurance policy through work.  His current annual income is roughly $50,000, and his wife makes roughly $60,000 as a school teacher.  Torres provided his financial information to Romo.

191. Romo recommended that Torres refinance his

mortgage.   Torres had a 30 year fixed rate loan at 5.95% with a monthly payment of roughly $2,500. Romo recommended an Option ARM to Torres so Torres would have the lowest possible monthly payment and have money to invest with Romo each month.

192. Romo also recommended that Torres take the monthly mortgage savings and purchase a VUL.

193. Torres told Romo he wanted to save for retirement. Romo indicated that  Torres could access the money in the VUL at any time without paying a penalty. Romo did not tell Torres the VUL had monthly fees and expenses.

194. Based on Romo's recommendation, Torres purchased a WRL Freedom Elite Builder II VUL on June 16, 2005. Ultimately, Torres was denied for medical reasons. The amount of insurance was $400,000 with a monthly premium payment of $266.

195. Again in May, 2006, Romo offered Torres a VUL with an initial investment of $3,880, a face amount of $500,000, and an annual premium of $3,880, but Torres was denied again for medical reasons.  Romo also offered a VUL to Torres' wife, but she was denied for medical reasons.  On April 25, 2007, Romo sold Torres a WRL Freedom Elite Builder II VUL for his son.

196. The VUL was not a suitable investment for Torres. Romo had no basis to reasonably believe that the

47

VUL was suitable based on Torres' financial needs, objectives, and circumstances.

197. Romo knew or reasonably believed that the VUL was unsuited to Torres' needs and failed to disclose this to Torres.

198. Romo's misrepresentations and omissions regarding the VUL were material.

199. Romo made the misrepresentations and omissions regarding the VUL with scienter.

**Investor Herbert Saralegui**

200. In or about September 2005, Romo met with investor Herbert Saralegui ("Saralegui"). Saralegui is 35 years old and lives in Baldwin Park, California. He is single with three dependent children. Saralegui resides with his girlfriend, who is not employed outside of the home, and her three children. Saralegui is a production manager at a print shop. Saralegui provided his financial information to Romo.

201. On September 25, 2005, Saralegui purchased a VUL with a death benefit of $500,000 and a monthly premium payment of $350 from Romo.

202. The VUL was not a suitable investment for Saralegui. Romo had no basis to reasonably believe that the VUL was suitable based on Saralegui's financial needs, objectives, and circumstances.

203. Romo knew or reasonably believed that the VUL was

48

unsuited to Saralegui's needs and failed to disclose this to Saralegui.

204. Romo did not disclose that the VUL would be subject to surrender fees, or that a portion of the premium paid each month would be used to purchase life insurance and would not be invested.

205. Romo also advised Saralegui to refinance his mortgage for the purpose of obtaining a lower monthly mortgage payment to free up money to invest in a VUL. Romo told Saralegui that he would make more money by refinancing and investing because the money invested in the VUL would earn more interest than what Saralegui would be paying on his mortgage. On November 22, 2006, Saralegui closed his negative amortization option ARM mortgage refinance.

206. Romo did not disclose to Saralegui that the payments on his mortgage would increase nor was Saralegui told that the principal balance on his mortgage would continue to increase despite making monthly mortgage payments.

207. Romo's misrepresentations and omissions regarding the refinance and the VUL were material.

208. Romo made the misrepresentations and omissions regarding the refinance and the VUL with scienter.

## FIRST CLAIM FOR RELIEF

## FRAUD IN THE OFFER OR SALE OF SECURITIES

## Violations of Section 17(a) of the Securities Act

209. The Commission realleges and incorporates by reference ¶¶ 1 through 208, above.

210. Defendants Ainsworth, Haro, Gutierrez, Paredes and Romo, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

    a.  with scienter, employed devices, schemes, or artifices to defraud;

    b.  obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.  engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

211. By engaging in the conduct described above, each of the defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

### SECOND CLAIM FOR RELIEF

**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

212. The Commission realleges and incorporates by reference ¶¶ 1 through 208, above.

213. Defendants Haro, Ainsworth, Gutierrez, Paredes and Romo, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

    a.   employed devices, schemes, or artifices to defraud;

    b.   made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c.   engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

214. By engaging in the conduct described above, each of

the defendants violated, and unless restrained and
enjoined will continue to violate, Section 10(b) of
the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-
5 thereunder, 17 C.F.R. § 240.10b-5.

### THIRD CLAIM FOR RELIEF

**AIDING AND ABETTING WGS' FAILURE TO CREATE ACCURATE
CUSTOMER ACCOUNT RECORDS AND ORDER TICKETS**

**Violations of Section 17(a) of the Exchange Act and
Rules
17a-3(a), 17a-3(a)(6) and 17a-3(a)(17)**

215. The Commission realleges and incorporates by
reference ¶¶ 1 through 208, above.

216. Section 17(a) of the Exchange Act requires WGS to
make and keep certain accurate books and records
relating to its brokerage business.  This includes,
among other things, customer account records which
contain accurate information regarding a customer's
annual income, net worth, and investment objectives
and order tickets.

217. WGS violated Section 17(a) and Rules 17a-3(a), 17a-
3(a)(6) and 17a-3(a)(17) of the Exchange Act by
failing to keep accurate customer account records
and order tickets for the transactions described
above.

218. Defendants Ainsworth, Gutierrez, Paredes and Romo
knew that WGS violated Section 17(a) of the
Exchange Act and Rules 17a-3(a), 17a-3(a)(6) and
17a-3(a)(17) thereunder because each falsified

52

customer account information by increasing net worth, annual income and monthly discretionary income and by falsifying order tickets indicating that the source of customer funds to purchase a VUL was not the proceeds of any mortgage or home equity loan.

219. Defendant Haro knew that WGS violated Section 17(a) of the Exchange Act and Rules 17a-3(a) and 17a-3(a)(6) thereunder because he falsified order tickets indicating that the source of customer funds to purchase a VUL was not the proceeds of any mortgage or home equity loan.

220. Defendants substantially assisted WGS in its primary violations of Section 17(a) of the Exchange Act and Rules 17a-3(a), 17a-3(a)(6) and 17a-3(a)(17) thereunder.

221. By engaging in the conduct described above, each of the defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Exchange Act and Rules 17a-3(a), 17a-3(a)(6) and 17a-3(a)(17) thereunder .

**PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that the Court:

**I.**

Issue findings of fact and conclusions of law that the defendants committed the alleged violations.

## II.

Issue orders, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining each defendant and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, and Sections 10(b) and 17(a) of the Exchange Act and Rules 10b-5, 17a-3(a), 17a-3(a)(6) and 17a-3(a)(17) thereunder.

## III.

Order each defendant to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest thereon.

## IV.

Order each defendant to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED:     September 29, 2008

*Karen L. Martinez*
Karen L. Martinez
Attorney for Plaintiff
Securities and Exchange
Commission

55

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Virginia A. Phillips and the assigned discovery Magistrate Judge is Oswald Parada.

The case number on all documents filed with the Court should read as follows:

### EDCV08- 1350 VAP (OPx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==============================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[X] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)          NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Karen L. Martinez
U.S. Securities and Exchange Commission
15 West South Temple Street
Suite 1800
Salt Lake City, Utah 84101
Telephone: (801) 524-5796

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Securities and Exchange Commission<br><br>PLAINTIFF(S)<br>v.<br>Kederio Ainsworth, Guillermo Haro, Jesus Gutierrez, Gabriel Paredes and Angel Romo,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>EDCV08-1350 VAP (OPx).<br><br><br>**SUMMONS** |

TO:    DEFENDANT(S):  _____

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Karen L. Martinez_____, whose address is _15 West South Temple Street, Suite 1800, Salt Lake City, Utah 84101_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

**OCT - 3 2008**

Dated: _____         By: _____
                                                    **LA'REE HORN**
                                                         Deputy Clerk
                                                    (Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

1192

CV-01A (12/07)                                **SUMMONS**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**COPY**

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)<br><br>United States Securities and Exchange Commission | **DEFENDANTS**<br><br>Kederio Ainsworth, Guillermo Haro, Jesus Gutierrez, Gabriel Paredes and Angel Romo |
| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br><br>Karen L. Martinez (Telephone (801) 524-5796)<br>U.S. Securities and Exchange Commission<br>15 West South Temple, Suite 1800, Salt Lake City, Utah 84101 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☑ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No          ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| | | | | |
|---|---|---|---|---|
| ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☑ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Act<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Info. Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes | **CONTRACT**<br>☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise<br>**REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **TORTS PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Fed. Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury-Med Malpractice<br>☐ 365 Personal Injury-Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 463 Habeas Corpus-Alien Detainee<br>☐ 465 Other Immigration Actions | **TORTS PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability<br>**BANKRUPTCY**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 445 American with Disabilities - Employment<br>☐ 446 American with Disabilities - Other<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence Habeas Corpus<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus/ Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>**FORFEITURE/ PENALTY**<br>☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety /Health<br>☐ 690 Other | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS-Third Party 26 USC 7609 |

**FOR OFFICE USE ONLY:**  Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

EDCV08-1350