Karen L. Martinez (Utah Bar No. 7914)
martinez@sec.gov
Thomas M. Melton (Utah Bar No. 4999)
meltont@sec.gov
Jennifer Moore (New York Bar No. 3054301)
mooreje@sec.gov
Paul Feindt (Utah Bar No. 8769)
feindtp@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
15 West South Temple, Suite 1800
Salt Lake City, Utah 84101
Telephone:   (801) 524-5796
Facsimile:   (801) 524-5262

Local Counsel:
Karen Matteson (Cal. Bar No. 102103)
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036-3648
Telephone:   (323) 965-3840
Facsimile:   (323) 965-3908

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

**EASTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>  Plaintiff,<br><br>  vs.<br><br>KEDERIO AINSWORTH, GUILLERMO HARO, JESUS GUTIERREZ, GABRIEL PAREDES and ANGEL ROMO,<br><br>  Defendants. | EDCV08-1350 VAP (OPx) |

**EXPERT REPORT,
CRAIG J. MCCANN, PH.D., CFA
DECEMBER 11, 2009**

## I. QUALIFICATIONS AND REMUNERATION

### A. Qualifications

I am the President of Securities Litigation and Consulting Group, Inc. ("SLCG"). Prior to founding SLCG, I was a Director at LECG, a business unit of Navigant Consulting, Inc. Prior to joining LECG, I was Managing Director, Securities Litigation at KPMG LLP for two years.

I was a senior financial economist in the Office of Economic Analysis at the Securities and Exchange Commission (the "Commission") from 1992 to 1993 and from 1994 to 1995. While at the Commission, I worked on several securities fraud investigations including allegations of material omissions and misrepresentations. These projects included analysis of materiality, causation, illegal profits, losses avoided and monetary penalties.

I earned a Ph.D. in Economics from the University of California, at Los Angeles. My dissertation examined the incidence of golden parachutes and their effect on stock prices using an event study. Financial economists use event studies to determine whether information released was material and was previously non-public. I hold the Chartered Financial Analyst (CFA) designation. Three years of practical investment management experience and the successful completion of a series of three day-long exams are required to receive the CFA designation.

I have taught graduate investment management at Georgetown University and at the University of Maryland, College Park. These courses include extensive discussions of securities valuation, portfolio construction and performance monitoring. I have held Series 7 and Series 63 National Association of Securities Dealers ("NASD") registrations.

My consulting work over the fourteen years since I left the Securities and Exchange Commission has primarily involved the analysis of investments. I have

spoken at length at continuing legal education programs put on by Bar Associations around the country and by the North American Securities Administrators Association, the United States Securities and Exchange Commission, and the Texas Securities Commission. I have been hired as a consultant and expert witness in investigations by many state and federal agencies including the U.S. Securities and Exchange Commission and the Department of Justice.

My resume, which includes a list of all publications authored by me within the last 10 years and the cases in which I have testified as an expert at trial or by deposition within the last four years, is attached as Exhibit 1.

## II. REMUNERATION

SLCG is being compensated for its time and expenses. My hourly rate is $475. Other SLCG personnel working on this matter have billing rates of $100 to $275 per hour.

## III. MATERIALS REVIEWED

In preparing this report, I have reviewed the following information:

a. the Complaint, September 29, 2008;
b. Deposition of Antonio Arteaga, September 24, 2009 with Exhibits;
c. Deposition of Antonio-Castro-Vera, October 6, 2009 with Exhibits;
d. Deposition of Guillermo Haro, October 21, 2009 with Exhibits; and
e. Materials cited in footnotes herein.

## IV. ASSIGNMENT

I have been asked by counsel for the Commission to review the sales of variable universal life ("VUL") investments by Defendant Haro to investors paid for with the proceeds from mortgage refinancing that allowed homeowners to cash-out some

existing home equity or temporarily reduce monthly mortgage payments, thereby freeing up short term periodic cash.[1]

## V. SUMMARY OF OPINIONS

VUL investments combine features of whole life insurance with features of mutual fund investments. A substantial portion of investors early payments are effectively paid to the sales agent as commissions and are unrecoverable due to high surrender charges in the event the investor needs to withdraw his or her investment. These high costs make VULs, at best, long term investments.

VUL's long term viability is determined by the annual insurance and distribution charges and by the returns earned on the underlying mutual fund-like investments. The riskiness of the investment returns thus puts investors' capital and insurance coverage at risk.

Refinancing debt – mortgages in this case – to cash out equity increases the risk an investor faces unless the proceeds are used to purchase an asset that is uncorrelated with the mortgaged asset at fair prices. Negative amortizing loans, which cause the unpaid principal balance to increase over time, share this feature with cash-out refinancing transactions.

Both sales of VULs and mortgage refinancing are fertile grounds for sales abuses. In this case, the Defendant Haro combined these disparate investments to substantially harm his clients.

---

[1] I have omitted any discussion of the Defendants who made offers of settlement to the Commission at the court-ordered settlement conference held in Riverside, California on December 8, 2010. If necessary, I will amend this report in the future to reflect my analysis of the conduct of the other Defendants.

## VI. BACKGROUND

### A. Variable Universal Life

Investors who buy VUL investments commit to pay high annual premiums for long term life insurance. This commitment is enforced by requiring an initial premium that exceeds the first year's cost of insurance ("COI") charge and periodic supplemental premiums. The first year's premium and ongoing periodic premiums are invested in subaccounts similar to investments in variable annuities. The nominal value of these subaccounts fluctuates with the net returns earned on the subaccounts' portfolio of investments.

Tax deferral is one of the main marketing points used to sell VULs. That is, although investments in VULs are made with after tax dollars, returns accumulate inside the VUL on a tax deferred basis. This feature of VULs is essentially identical to variable annuities and is used to oversell VULs. Because of the high costs associated with typical VULs, including the VULs involved in this case, and variable annuities, their tax deferral feature only produces a net benefit if 1) the investor has exhausted other tax deferred options, 2) ongoing costs are minimized and 3) the subaccounts hold fixed income investments.

The COI is deducted from the value of the investment subaccounts. If the subaccounts are not sufficiently funded or the net investment returns are not sufficiently large, the cumulating COI deductions will eventually reduce the value of the subaccounts and force the investor to make additional premium payments to keep the insurance in force.

Unlike variable annuities, the surrender charges on VUL contracts, including the ones at issue in this case, roughly equal the first year's premium. If the investor abandons or "lapses" the VUL contract in the first few years, the cash surrender value

of a VUL is likely to be essentially zero. The early premium payments have largely been used to pay commissions and motivate the sales force.

Depending on the initial premium funding, the contract's face value, the COI and the investment returns it is highly likely the investor will abandon the investment shortly after entering into the contract. Industry experience confirms these fundamental economics. The following figure is Figure 39 from an industry study, reporting the annual lapse rates for various types of insurance policies.[2]



Most VULs are abandoned after substantial payments during a period when the coverage was of little value. 12% of VULs are abandoned each year during the first four years. Roughly half the VUL contracts are abandoned within five years and roughly two-thirds of the contracts are abandoned within ten years. Since the cash surrender value is close to zero in early years, VULs, in practice, amount to extraordinarily high cost insurance contracts which expose insurance companies to little mortality risk. Virtually all the payments made by investors who ultimately

---

[2] U.S. Individual Life Persistency Update, A Joint Study Sponsored by LIMRA International and The Society of Actuaries, 2005.

abandon the contracts are paid to the sales force or add to the insurance companies' profits. Thus, at least *ex poste*, VUL purchases reflect very poor systematic consumer choices or systematic aggressive sales practice abuses.

### B.     Refinancing and Negative Amortizing Debt

Mortgages are typically loans taken out by individuals and families to purchase a home and are secured by the financed property. Interest charges are assessed monthly and added to the loan balance. Borrowers make monthly payments of principal and interest over a term referred to as the amortization period. At the end of the amortization period – traditionally 30 years – the mortgage is paid off and the home is unencumbered.

A homeowner's equity is initially equal to the difference in the value of the home and the amount borrowed. Thereafter the homeowner's equity will fluctuate depending on the value of the home and how much of the mortgage's original principal has been re-paid to date. The shorter the amortization period, the higher the monthly payment, the more of the payment is paying down the loan balance, the more rapid the increase in the homeowner's equity and the faster the mortgage is paid off.

Mortgage lenders have offered loans that did not include the systematic repayment of any principal over time. These "interest only" loans required homeowners to pay only the assessed period interest charges; hence the loan balance remained unchanged over time. Some mortgages don't even require the homeowner to pay the assessed periodic interest charges. The principal balance on these negative amortizing loans increases over time as the accumulated unpaid interest is added to the loan balance.

The homeowner's equity provides some security for the lender and for the homeowner that the homeowner will be able to absorb fluctuations in the market value

of the home and variation in the household's periodic cash flows. Refinancing to take cash out or to switch to negative amortizing loan increases the homeowner's leverage and therefore his or her risk to fluctuations in home prices or variations in periodic income and expenses.

### C. Purchasing VULs With Home Equity

VULs are leveraged investments in the stock and bond subaccounts with an attached commitment to continue to pay for life insurance coverage. When the initial premium or periodic payments to fund and maintain the VUL are generated from a mortgage refinancing, the harm from each is compounded.

Consider a simple, stylized example. Prior to a VUL/mortgage refinancing, a household has a $200,000 home with no other assets and a mortgage of $100,000 and other installment debt of $25,000. This household's financial well being is subject to fluctuations in home prices and variations in its monthly income and expense. The household's $75,000 net worth and the likelihood of variations in its monthly income and expenses provide a useful way of assessing how much the household is financially "at-risk".

Now imagine that this household refinances the mortgage to take out $50,000 of the home equity for home improvements, $25,000 to pay off the installment debt and $25,000 to invest in a VUL. Despite the appearance that the $25,000 is invested in subaccounts, virtually all of the initial premiums go to the agents or the gross profits of the insurance company. The net value of the VUL is essentially zero because the surrender charges roughly equal the premiums.

For low to moderate income households the purchase of a VUL with home equity is a catastrophe. After the VUL/refinancing transaction, the household is still exposed to the same housing price, income and expense risks but the household's net

worth has dropped from $75,000 to $50,000 and the household has committed to increased monthly mortgage payments or ever increasing loan balances and large ongoing payments to keep high cost insurance in force.

## VII. DEFENDANT HARO COMBINED ABUSIVE VUL SALES PRACTICES WITH AGGRESSIVE MORTGAGE REFINANCING

### A. Aurora and Antonio Arteaga

Mr. and Mrs. Arteaga were in their mid 50s when they were approached by Defendant Haro to refinance mortgage on their modest home and take out equity to invest through Defendant Haro's firm. The Arteagas' home was worth between $200,000 and $379,000 and had a first lien mortgage of $88,104 against it. As a result of the refinancing the mortgage balance increased to $200,000.

Mr. Arteaga worked as a mechanic and Mrs. Arteaga worked as a babysitter. The Arteagas' tax returns reflect adjusted gross income of $19,128 in 2005, $21,305 in 2006 and $30,949 in 2007. The Arteagas used $22,000 of the proceeds from the mortgage refinancing to fix the roof and do some minor renovations. They paid $12,000 for the first year's premium on a Western Reserve Life VUL and used the remainder of the refinancing proceeds to pay down debts and to save. The following year they made one more payment of $12,000 into the VUL, which has subsequently lapsed.

The harm inflicted on the Arteagas by Defendant Haro was as certain as it was severe. The Arteagas could not meet their obligations including the higher interest charges on the new mortgage, the premiums on the VUL and their other household expenses as a result of the home refinance and purchase of the VUL. The Arteagas also could not maintain the VUL without extraordinary, persistently positive returns on the investments within the subaccounts. Defendant Haro's actions transferred some of the Arteagas' modest net worth to Defendant Haro and others leaving the Arteagas

dramatically more at risk to fluctuations in home values, personal income and, for the first time, the stock market.

### B. Antonio and Ernestina Castro

Mr. and Mrs. Castro were in their mid-30s when they were approached by Defendant Haro to refinance their mortgage and take out equity to invest through Defendant Haro's firm.

Mr. Castro was employed with the LA County Sherriff's Department and made between $4,500 and $5,000 per month at the time of the mortgage refinancing. Previously Mr. Castro had been earning $30,000 as a drug counselor. Mrs. Castro, who was in poor health, also worked at the LA County Sherriff's Department and made approximately $2,200 per month. Contemporaneous documents reflect that the Castros' net worth was only $40,000. The Castros refinanced their mortgage and used $55,000 of the proceeds to pay for the first year's premium on a Western Reserve Life VUL. The Castros have since surrendered the VUL.

As with the Arteagas, the harm inflicted on the Castros by Defendant Haro was as certain and severe. The Castros could not meet their obligations including the higher interest charges on the new mortgage, the premiums on the VUL and their other household expenses as a result of the home refinance and purchase of the VUL. Defendant Haro's actions transferred some of the Castros' modest net worth to Defendant Haro and others leaving the Castros dramatically more at risk to fluctuations in home values, personal income and the stock market.

### VIII. CONCLUSIONS

The VULs sold by Defendant Haro are high cost insurance/investment hybrids that are rarely prudent. They were sold based on tax deferral and insurance features which are of no value to households like the Arteagas and the Castros because they

provide extraordinary commissions to agents like Defendant Haro. The harm caused by the sale of VULs in this case was compounded by funding of those purchases with mortgage refinancing.

Defendant Haro effectively expropriated much of his clients' net worth for his own personal benefit. There was no reasonable expectation at the time of the securities transactions I have reviewed that Defendant Haro's clients would benefit.

While most financial professionals are honest and strive to serve their clients' interests, in my career I have been exposed to a small sample of financial professionals who have abused their positions of trust. The conduct of Defendant Haro in selling VULs to low income families through leveraging up their modest homes is perhaps the most egregious abuse of investors I have encountered as a researcher and consultant focused on retail investments for the past 20 years.

_____
Craig J. McCann
Fairfax, VA