Karen L. Martinez (Utah Bar No. 7914)
martinez@sec.gov
Thomas M. Melton (Utah Bar No. 4999)
meltont@sec.gov
Jennifer Moore (New York Bar No. 3054301)
mooreje@sec.gov
Paul Feindt (Utah Bar No. 8769)
feindtp@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
15 West South Temple, Suite 1800
Salt Lake City, Utah 84101
Telephone:     (801) 524-5796
Facsimile:     (801) 524-5262

Local Counsel:
Karen Matteson (Cal. Bar No. 102103)
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036-3648
Telephone:     (323) 965-3840
Facsimile:     (323) 965-3908

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          Plaintiff,<br><br>     vs.<br><br>KEDERIO AINSWORTH, GUILLERMO HARO, JESUS GUTIERREZ, GABRIEL PAREDES and ANGEL ROMO,<br>          Defendants. | EDCV08-1350 VAP (OPx) |

### EXPERT REPORT OF PAUL MEYER

### DECEMBER 11, 2009

<u>Qualifications</u>

I am a Principal and Testifying Witness employed by Securities Litigation and Consulting Group ("SLCG"), Fairfax, Virginia.  Prior to joining SLCG I was Principal of Paul F. Meyer LLC, which provided litigation consulting and expert witness testimony in securities industry matters.  I have been qualified as an expert in Federal and State Courts, and by FINRA and JAMS arbitration panels.

I worked in the securities industry continuously for 26 years, from 1979 through 2005.  During that time my only employer was Smith Barney or a predecessor firm.  I have 12 years of experience as a registered representative, nine years as a branch office manager, and five years as a regional officer.

When employed in the securities industry, I held the following licenses: Series 3, Series 7, Series 8, Series 63, Series 65, and Registered Options Principal.

A copy of my resume accompanies this report, including a list of all other cases during the past four years in which I have testified as an expert at trial or by deposition.

<u>Remuneration</u>

SLCG is compensated for my time at the rate of $275 per hour, plus expenses.

Assignment

Counsel for the United States Securities and Exchange Commission asked me to explain certain concepts related to the regulation of the securities industry. In addition, SEC counsel has asked me to describe the major duties and obligations of a registered representative, particularly as they relate to the sale of variable universal life insurance products and the use of liquefied home equity for investment purposes. Finally, SEC counsel has asked me to review documents relating to certain customers of Guillermo Haro while he was employed by World Group Securities as a registered representative.

Materials Reviewed

- The Securities Exchange Act of 1934

- World Group Securities Written Supervisory Procedures Manual, May 2003, revised 2006

- Declaration of John Czecuik dated November 30, 2009

- Securities and Exchange Commission vs. Kederio Ainsworth, et al., case no. EDCV08-1350, Complaint filed October 3, 2008

- Deposition of Guillermo Haro dated October 21, 2009

- U.S. Securities and Exchange Commission publications

o   Broker-Dealer Guide

o   Joint SEC/NASD Report On Examination Findings Regarding Broker-Dealer Sales of Variable Insurance Products

o   Variable Annuities: What You Should Know

o   Variable Annuities and Variable Life Products: Questions to Ask

o   Investor and Industry Perspectives on Investment Advisers and Broker-Dealers Angela A. Hung, Noreen Clancy, Jeff Dominitz, Eric Talley, Claude Berrebi, Farrukh Suvankulov, Sponsored by the United States Securities and Exchange Commission INSTITUTE FOR CIVIL JUSTICE LRN-RAND Center for Corporate Ethics, Law, and Governance

- FINRA Rules

o   2010

o   2310

o   IM-2310-2

o   3010

- FINRA Notices to Members

  o 96-86, NASD Regulation Reminds Members And Associated Persons That Sales of Variable Contracts Are Subject To NASD Suitability Requirements

  o 97-19, Heightened Supervision

  o 99-35, The NASD Reminds Members Of Their Responsibilities Regarding The Sale Of Variable Annuities

  o 00-44, The NASD Reminds Members Of Their Responsibilities Regarding The Sales Of Variable Life Insurance

  o 03-71, Non-conventional Investments

  o 03-68, Fee-Based Accounts

  o 04-89, Liquefied Home Equity

- FINRA Investor Alerts

  o Betting the Ranch: Risking Your Home to Buy Securities

  o Choosing Investments – Overview

- Letter from Wendy Taylor, World Group Securities, to Guillermo Haro, October 31, 2008

- Expert Report of Craig J. McCann, December 11, 2009

  - As To Customers Leopoldo and Estela Linares, Alfonso and Maria Herrera, Eduardo Linares and Consuelo Del Toro, Walter Ingram, Antonio and Aurora Arteaga, and Gualberto and Oliva Castro, and Luis and Lydia Dominguez

  - WGS Client Account Forms

  - WGS Order Tickets

  - Prospectus describing Western Reserve Life's Freedom Elite Builder II variable universal life insurance product

  - Applications for life insurance

  - Risk profile questionnaires

  - Account statements created by Western Reserve Life

  - Account statements created by the mutual fund companies in which these client invested

  - Deposition or interview testimony

o  Documents related to refinancing transactions

Part One: Background

Introduction

The securities markets perform the essential function of bringing together businesses in need of capital with investors who have that capital. Highly developed, smoothly functioning markets are vital to business growth, job creation, and improved standards of living.

The stock market Crash of 1929, and the Great Depression that followed, caused widespread distrust of Wall Street. The public feared that investing was far too risky and that the marketplace was not fair. Yet without investment capital the economy could not grow again. So Congress enacted a series of laws designed, in part, to restore investors' confidence by subjecting the securities industry to strict rules of conduct and oversight.

Regulation of the Securities Industry

One of the laws[1] enacted in the aftermath of the Crash created the United States Securities and Exchange Commission (the "SEC") and charged it with the responsibility of overseeing the securities industry. The SEC, in turn, has delegated day-to-day

responsibility for governing securities brokers and dealers to a separate organization, the Financial Industry Regulatory Authority[2] ("FINRA"). FINRA makes the rules brokers must follow in dealing with customers and acts as the "cop on the beat" by examining brokers and administering disciplinary measures when appropriate. In this report I will refer frequently to FINRA's rules, notices to its members, and other FINRA-published material.

Companies that operate in the securities industry are called broker-dealers. To become a broker-dealer, a firm must go through an extensive registration process with the SEC and agree to conduct their business according to the strict rules and guidelines of FINRA. The purpose of such a rigorous application process is "the protection of investors."[3] After getting initial approval, a new broker-dealer is inspected after its first six months in business and at regular intervals thereafter. These safeguards are in place to ensure that individual investors are treated fairly and the markets continue to perform their vital role in the economy.

---

[1] The Securities Exchange Act of 1934 (the "Exchange Act")

[2] FINRA is the organization created by the merger of the former National Association of Securities Dealers ("NASD") with the regulatory functions of the New York Stock Exchange.

<u>Why do investors need protection?</u>

The securities industry is a very complex enterprise. Issuers of securities (companies), investors, underwriters, analysts, clearing and transfer agents, dealers, and securities exchanges are all interconnected by sophisticated technology. Industry professionals devote their careers searching out investment opportunities, aided by state-of-the-art knowledge and instant access to information from all over the world. The individual public investor cannot possibly compete with these highly sophisticated professionals; yet, his willingness to invest is crucial to the economy. For many investors the solution is to seek the help of a brokerage firm.

<u>Role of the Registered Representative</u>

To a retail customer, the most important person at the broker-dealer is the registered representative (the "RR" or "broker") handling his account. Because the broker has such serious obligations to his customers, a major element of the investor protection scheme is the qualification and screening process required to become a RR. A broker-dealer is required to thoroughly examine the background of anyone who wants to

---

[3] The Exchange Act, Section 15(a)(1). [Emphasis added.]

become a registered representative[4] and hire only those individuals who are of good character and will deal fairly and honestly with his or her customers.[5]  Finally, the prospective RR must pass a series of examinations designed to ensure he or she has enough knowledge to give competent investment advice.

Duties and Responsibilities of a RR

Both the SEC and FINRA set out in detail the high standards of conduct required of a RR.  The major principles to which an RR must always adhere include:

• Treat each customer with honesty and integrity;

• Place the interests of the customer first;

• Learn enough about the customer to render competent investment advice;[6]

• Assist the customer in establishing appropriate investment objectives and risk tolerance;

---

[4] *See* FINRA NTM 97-19 *and* FINRA Rule 3010.

[5] FINRA Rule 2010, Fair Dealing With Customers

[6]*See* SEC Broker-Dealer Guide, "A broker-dealer also has an obligation to determine customer-specific suitability. In particular, a broker-dealer must make recommendations based on a customer's financial situation, needs, and other security holdings. This requirement has been construed to impose a duty of inquiry on broker-dealers to obtain relevant information from customers relating to their financial situations and to keep such information current. [Self-regulatory Organizations] consider recommendations to be unsuitable when they are inconsistent with the customer's investment objectives."

• Recommend only those investments which are suitable,[7] in other words, are within his risk tolerance and consistent with his investment objectives; and,

• Ensure the customer understands all the important facts about an investment, especially its costs and risks.  The more complex the product, the greater the obligation to explain.

The suitability principle is broadly applied and includes such factors as the costs of an investment,[8] whether the product is affordable,[9] the customer's other investments, and whether borrowed funds will be used to make the investment. The fact-finding process must not be treated in a cursory way. Accurate, customer-specific information is essential to making suitable recommendations.  Unfortunately, RRs will sometimes complete new account forms with "guesstimates" and investment objectives that are not accurate or understandable to the client.

---

[7] *FINRA Rule 2310 (a) In recommending to a customer the purchase, sale, or exchange of any security, a member should have reasonable grounds for believing that the recommendation is suitable for such customers on the basis of the facts, if any, disclosed by the customer as to his security holdings and as to his financial situation and needs.*

Prior to the execution of a transaction recommended to a non-institutional customer (other than money market funds) a member shall make reasonable efforts to obtain information concerning the customer's financial and tax status, his investment objectives, and other reasonably necessary information.

[8] Common sense suggests that, the higher an investment's costs, the lower the return.  FINRA discusses this idea in NTM 03-68.  Although the Notice uses the example of fee-based accounts, the principle applies to any high-cost investment, such as variable universal life.

[9] FINRA IM-2310-2(b)(5) forbids the recommendation of an investment if there is "no reasonable expectation that the customer has the financial ability to meet such a commitment."

## Sale of Variable Universal Life Products

Broker-dealers and RR's have additional obligations when recommending variable universal life insurance products ("VULs"). These products are complicated,[10] and have several moving parts. In the interest of protecting potential VUL investors, FINRA has issued several Notices to Members ("NTMs")[11] warning that the product is susceptible to misrepresentation in the sales process. Their major concerns include:

- The product could be represented as an investment vehicle, rather than as a life insurance policy;

- The product could be sold to customers who do not understand that they are buying life insurance;

- The product could be sold to customers who have no legitimate need for life insurance; and

- The sales and marketing material used to sell the product could be misleading or omit important information.

---

[10] *See* Expert Report of Craig J. McCann, filed concurrently herewith, for a detailed explanation of VULs, including their costs and expenses.

[11] A Notice to Members is a publication FINRA sends to its member firms. Some of these notices are technical in nature, others provide guidance on an aspect of business conduct with the public.

The SEC has offered its own advice to potential VUL investors by posing the following list of questions.[12]

> **Might I need this money in the next few years?**
>
> Variable products are long-term investment vehicles. They aren't appropriate if you'll need your money in the short term because substantial taxes and insurance company charges may apply if you withdraw your money early.
>
> **Do I have enough money right now to purchase this product?**
>
> Because variable products are long-term investments, it can be dangerous to your financial health to mortgage your home in order to purchase a variable annuity or variable life insurance product. If a salesperson pressures you to do so, call us instead at 1-800-SEC-0330.
>
> **Does the firm recommend this product to all its customers?**

---

[12] U.S. Securities and Exchange Commission, Variable Annuities and Variable Life Products: Questions to Ask.

Everyone has different investment objectives. Variable products are not "one size fits all." Be careful if a [RR] recommends one product to all customers. That may mean the product isn't right for you.

**What will I lose if I exchange this product?**

If a salesperson is urging you to exchange your variable product for a new contract, you'll need to compare both products carefully, because: the guaranteed death benefit of the new product may be less than the old, you may have to pay a "surrender charge" to get out of the old product, the new product may impose higher annual fees and a new surrender charge, and the new product may impose a new surrender charge period.

To justify the suitability of a VUL recommendation, the RR must have a thorough and <u>accurate</u> picture of his customer's personal and financial circumstances. FINRA lists the

following information as essential to making a suitability determination:[13]

- Annual income;

- <u>Liquid</u> net worth;

- Investment objectives;

- Ability to tolerate risk;

- Investment experience; and,

- <u>Source of money funding the purchase.</u>

Finally, NTM 00-44 warns that "the member [the broker-dealer and its RR's] should consider whether the customer desires and needs life insurance and can afford the premiums needed to keep the policy in force."[14]

<u>Prospectus delivery</u>

Variable universal life products are described in a document called a prospectus. Although intended to convey important information, a prospectus has some serious shortcomings for most retail investors. The document itself is long, printed in small type, and full of unfamiliar terms and concepts.[15]

---

[13] NTM 00-44 [Emphasis added.] *See also,* NTM 99-35, "The myriad features of variable life insurance products make the suitability analysis required under NASD rules particularly complex."

[14] <u>Id.</u>

[15]*See* SEC Plain English Rule, "Commission rules require mutual fund prospectuses to contain key information about investment objectives, risks, and expenses that, while important to investors, can be difficult for investors to extract. Prospectuses are often long, both because they

**Footnote continued on next page**

We know from professional experience[16] that few investors ever read a prospectus, primarily because they have difficulty understanding it.   A major study, commissioned by SEC and conducted by the RAND Corporation, recently confirmed this and offered other observations about documents given to retail investors.[17]   "The majority of interviewees [in the RAND study said] that disclosures [such as a prospectus] do not help protect or inform the investor, primarily because few investors actually read the disclosures.   Many participants said that they think that the disclosures themselves are the root of the problem. The way that prospectuses are written is not easily

---

contain a wealth of detailed information, which our rules require, and because prospectuses for multiple funds are often combined in a single document. Too frequently, the language of prospectuses is complex and legalistic, and the presentation formats make little use of graphic design techniques that would contribute to readability."

*See also,* Investor and Industry Perspectives on Investment Advisers and Broker-Dealers Angela A. Hung, Noreen Clancy, Jeff Dominitz, Eric Talley, Claude Berrebi, Farrukh Suvankulov, Sponsored by the United States Securities and Exchange Commission INSTITUTE FOR CIVIL JUSTICE LRN-RAND Center for Corporate Ethics, Law, and Governance (the "RAND Report"), "First, they [prospectuses] are not written in a way that is easily understandable to the average investor, and the information they provide is inadequate."

[16] *See* RAND Report, "Interview participants [from the securities industry] reported that investors rarely read the disclosures they provide, regardless of how digestible they make these documents. They acknowledged that their business relationships with clients are built on trust rather than investor understanding of the services and responsibilities involved and that it is crucial for the financial service industry to maintain that foundation of trust."

[17]*Id.*, "Several of the [brokerage firm] representatives interviewed acknowledged that, regardless of how carefully they crafted documentation, investors rarely read these disclosures."

understandable to the average investor, and the information in disclosures is not sufficient."[18]

Recognizing the practical problems involved in using a prospectus to convey important information to public investors, FINRA has cautioned brokers that simply delivering a prospectus is not sufficient to discharge their duty to fully explain an investment vehicle. NTM 03-71 reminds broker-dealers "that merely providing a prospectus or offering memoranda does not cure unfair or unbalanced sales or promotional materials, whether prepared by the sponsor, or issuer."[19]

Investing with Liquefied Home Equity

In late 2004 FINRA expressed great concern about the number of people who were refinancing their home and using the withdrawn cash to make other investments. In NTM 04-89, FINRA offers a thorough explanation of the material risks involved in this strategy. The major concern, of course, is that poor investment performance could put the borrower/investor in a position where he or she can no longer make his or her mortgage payment without selling the investment asset at a depressed price.

---

[18] Id.

[19] FINRA Notice to Members 03-71. *See also* James B. Chase, Securities Exchange Act Release No. 47476 (Mar. 10, 2003) (citing Patrick G. Keel, 51 S.E.C. 282, 284 (1993). "A registered representative must "be satisfied that the customer fully understands the risks involved and is . . . able . . . to take those risks."

However, several other potential pitfalls await anyone who invests this way.  Given its importance, we quote extensively from the Notice.

> When liquefying home equity for investments in securities, homeowners, in pursuit of lower interest rates, also may select a mortgage or home equity loan with a <u>variable interest rate</u>. In an environment of increasing interest rates, as exists today, homeowners <u>could see a significant increase in their debt service payments</u> potentially forcing a sale of investments to meet these higher obligations.
>
> In addition, investors may fail to recognize certain potential conflicts of interest, for example, a broker's interest to capture commissions or fees on investments from liquefied home equity. In addition, <u>if the member or its affiliate is the lender, investors may not understand that they also will be paying compensation to the member or its affiliate for originating and/or servicing the loan.</u> Conflicts also may exist even in the absence of an affiliate relationship if a

member receives referral or other payments from a lender.

Finally, liquefying home equity may undermine the asset diversification benefit of home ownership. While home values fluctuate, they may not be correlated with equity or securities markets. Moreover, homes are an illiquid investment, given the generally high transaction and other costs associated with moving. Because of this, many homeowners do not realize gains (or losses) in the appreciation (or depreciation) in their homes. However, once liquefied for investments in securities, a homeowner can much more easily and quickly lose the equity in his or her home.[20]

Simply stated, using liquefied home equity to make other investments is financially dangerous. A RR who makes such a suggestion violates his obligation to make suitable recommendations.

Part Two: World Group Securities, Ainsworth Financial Mortgage Corp., and Guillermo Haro

World Group Securities and Haro

---

[20] NTM 04-89. [Emphasis added.]

- 19 -

World Group Securities ("WGS") is a broker-dealer registered with the SEC and a member of FINRA. Defendant Guillermo Haro[21] ("Haro") held several licenses, including life insurance, Series 63,[22] Series 6,[23] and Series 26.[24] He was employed by WGS as a RR during the period of time at issue in this case. Haro's conduct was governed by SEC laws and regulations, FINRA's rules and his firm's Written Supervisory Procedures.

WGS's Written Supervisory Procedures

As it was required to do under FINRA Rule 3010, WGS maintained policies and procedures that set out in detail the rules their RR's must follow in doing business with customers. WGS has turned over to the SEC a "Written Supervisory Procedures Manual" (the "Manual") dated May 2, 2003, revised June 22, 2006. The Manual addresses many of the issues we will be raising in our analysis of Haro's customer accounts. For example:

---

[21] This report addresses only the conduct of Haro. We understand that settlements have been reached with the remaining Defendants pursuant to a court-ordered mediation conducted December 8, 2009.

[22] The Uniform Securities Agent State Law Examination qualifies a broker to sell securities in the various states.

[23] The Investment Company Products/Variable Life Contracts Representative Exam allows a broker to sell mutual funds and variable life insurance products.

[24] The Investment Company Principal Exam qualifies one as a supervisor in a broker-dealer.

- **Section 8.20** prohibits an RR from recommending that a customer borrow money to finance the purchase of an investment.

- **Section 9.02** states that an RR may not recommend a variable insurance product "if the client expresses an inability to understand the complexity of variable products, appreciate the allocation of premium, understand [the] fees, expenses, and investment objectives of the sub-accounts(s). "The RR must make sure "the premium is affordable" in the context of the customer's income and expenses.

WGS also publishes from time to time memoranda known as Compliance Alerts or Supervisory Alerts. These memos address a specific topic in detail and provide additional sales practice guidance to its RR's. Several such Compliance Alerts are relevant to this case.[25]

- Compliance Alert, April 26, 2004, **Suitability Issues Related to Mortgages**. The alert forbids WGS RRs from using home equity to fund a customer's investments.

- Supervisory Alert, January 21, 2005, **Liquefying Home Equity for Securities Purchases**. This memo repeats the admonitions given in the earlier Alert.

---

[25] *See* Declaration of John Czecuik, November 30, 2009.

- Supervisory Alert, April 7, 2007, **Member Firm Fined & Branch Manager Permanently Barred for Lax Supervision.** The memo points out that FINRA had barred from the industry a supervisor who, among other things, had been "selling primarily one product to all customers [and] recommending the use of home equity to make securities purchases." The memo also points out that the RR used the same investment objectives and risk tolerance for most of her clients, even though there was a wide variation in their circumstances and financial needs.

- Supervisory Alert, June 18, 2007, **Mortgage Refinancing Savings & Monthly Discretionary Income.** This memo forbids the practice of using potential savings resulting from a refinance to fund investments in securities.

- Compliance Alert, dated December 18, 2007, Missed Fortune 101. This memo forbids the use of any sales presentations of material based on a book titled **Missed Fortune 101.**

Ainsworth Financial Mortgage Corporation

Ainsworth Financial Mortgage Corporation ("AFMC") was a mortgage broker and an Affiliate Broker for WGS. As an Affilate Broker, AFMC paid WGS 25% of the fees received from loans referred to them by WGS brokers.

<u>Part Three: Certain Customers of Guillermo Haro[26]</u>

<u>Customers Leopoldo and Estela Linares</u>

On January 19, 2006 the Linareses closed on a re-financing of their previous home mortgage, withdrawing approximately $117,000 in cash.  They paid a fee of $2340 and a "yield spread" of $7020 to mortgage broker AFMC.  The new loan was a "1 month CODI" adjustable rate note.

Mr. and Mrs. Linares opened a WGS account with Haro on January 28, 2006.  Mr. Linares was 63 and Mrs. Linares was 59. Their only source of income was Mr. Linares's employment as a fiberglass molder, where he earned $34,000 per year.  Haro described their risk tolerance as Moderate/High.  Their only liquid asset was an IRA valued at $32,000.  However, Haro stated on the new account form that their liquid net worth was $101,000.

On January 28, 2006 the Linareses used $73,000 of the cash received from the re-financing to invest in mutual funds ($58,000) and a variable universal life policy issued by Western Reserve Life Assurance ($15,000).  Both investments were made at the recommendation of Haro.

Neither the mutual fund purchase nor the recommendation of the purchase of a VUL was suitable for these customers.  Given that they have no liquid net worth, the Linareses true

---

[26] We understand that depositions have yet to be taken for certain customers not included in this report.  We reserve the right to amend our report based on information obtained in those depositions.

investment objective was the accumulation of liquid savings. Until they built an adequate reserve, no other investment expenditure can be justified.   In addition, a VUL was unsuitable because it was misrepresented to the Linareses as an investment vehicle, rather than life insurance.[27]

Customers Alfonso and Maria Herrera

Alfonso and Maria Herrera opened an account with Haro on November 5, 2006.   Mrs. Herrera was 46 years old and a homemaker.   Mr. Herrera earned $45,000 per year.   Their investment objective was stated as Preservation of Capital with low risk tolerance.   They had no investment experience.   On October 30, 2006 the Herreras refinanced their home mortgage through AFMC, which generated total fees of $11,312.

The Herreras withdrew $26,226 from the refinance.   Upon Haro's recommendation, they took out a VUL, initially funded with $2,000.   Haro supplied the customers with a projection of future values for their VUL.   The illustration assumed a 12% rate of interest.   This assumption was unreasonably high, did not reflect the expected returns from the policy, and was materially misleading.

Mrs. Herrera's testimony reveals that:

- Haro reassured the customers that they would have no difficulty making their new mortgage payment and still fund their VUL.  This was false.

---

[27] Ultimately both policies were rejected because Haro did not state the

**Footnote continued on next page**

- The customers were unsophisticated and had no understanding of the financial markets.

- The liquid net worth stated on the new account form was false. The $25,000 listed on the form was really the cash from the refinance, which the customers used to pay down debt. Haro knew this representation was false when he signed the form.

- Haro described the VUL's primary purpose to the Herreras as a retirement savings vehicle, in direct contradiction to the sales practices mandated by FINRA.

Customers Eduardo Linares and Consuelo Del Toro[28]

These customers refinanced their home mortgage through Haro and AFMC. They closed on March 31, 2006, using approximately $20,000 of withdrawn cash to pay off debts. AFMC was paid $3494 in fees.

On June 5, 2007 these customers borrowed $78,600 from Pro Services Rendered LLC, an entity owned and controlled by Haro. This transaction is a violation FINRA Rule 2370 and WGS suitability policy 8.19, each of which prohibits a RR from loaning a customer money.

Mr. Linares and Ms. Del Toro wrote a letter to the SEC Regional office in Salt Lake City. They allege that Haro recommended that they refinance their home and use the proceeds

_____

investment's source of funds on the application.

to buy life insurance.  They further allege that Haro used "his personal funds" to make the loan referenced above.  These customers had little understanding of the transactions facilitated by Haro, and they had no way of anticipating the damaging financial ramifications that would result, should their mortgage payment rise to an amount they could not afford, or should they have need for their funds while subject to withdrawal penalties.  Haro had an obligation to fully disclose all the material facts associated with his recommendations.  He failed to do so.

Several sales practice violations committed by Haro render these transactions totally unsuitable.  Haro's recommendation that the customers use cash withdrawn from a refinancing of their home mortgage is a clear violation of both firm and FINRA rules.  In addition, the customers had no understanding of what was being recommended to them, a fact that would have been obvious to a competent adviser.  Finally, the loan from Haro's LLC is a clear violation of both industry and WGS policies.

Customer Walter Ingram

Mr. Ingram opened an account with Haro on October 30, 2006.  He completed a refinancing through AFMC on December 1, 2006, taking out $69,000.  AFMC earned fees of $4500.  Five days later Mr. Ingram made an initial payment of $515 on a VUL

---

28 I reserve the right to amend this section of my report, pending the deposition testimony of either customer.

issued by Western Reserve Life.   Mr. Ingram made the following
statements about Haro's communications:

- Haro did not accurately describe the terms of
  the new loan.  He told Mr. Ingram that the rate would
  be 1% for the first 12 months.   In fact the 1% rate
  applied only to the first month.

- Haro described the VUL as an investment product.

- Haro projected the return Mr. Ingram would earn
  on the VUL.

There is no financial justification for Mr. Haro's
recommendation of a VUL for this customer.   Mr. Ingram's
primary objective was saving and investing for retirement.  The
VUL's expenses, including the cost of unnecessary life
insurance, make it a very poor choice as an investment vehicle.
A competent investment professional would have recommended less
expensive alternatives.

<u>Customers Antonio and Aurora Arteaga</u>

Antonio Arteaga was a mechanic, though he is currently
unemployed.   He and his wife provide financial support for
three children.   They have virtually no liquid net worth.
Their original conversations were with Vivian Imahata, a member
of Haro's branch and a WGS RR Haro trained.   They later met
with Haro.

On Haro's recommendation, these customers refinanced
through AFMC out of a fixed rate loan into an ARM in April
2006.   Mrs. Arteaga states that she did not understand the

terms of the loan, including the negative amortization[29] and the adjustable interest rate. Haro told the Arteagas that their mortgage rate would be fixed for five years.

Using funds withdrawn from the refinancing transaction, the customers invested a total of $24,000 in a VUL. The terms of the policy were not adequately explained to the Arteagas, and the forms the customers signed were completed by either Ms. Imahata or Haro. Both Ms. Imahata and Haro made refinancing through AFMC a precondition of buying the VUL. Haro told the customers that they would receive $50,000 from the VUL when Antonio turned 62. On Haro's recommendation, these customers also invested part of the refinance proceeds in mutual funds.

The Arteagas were in a precarious financial position even before they started doing business with WGS. They were in worse condition after taking Haro's advice. At the time they made the VUL and mutual fund purchases they had virtually no liquid net worth[30] and household income of approximately $20,000 per year. They could not afford life insurance, and they certainly lacked the liquidity necessary to make investing in financial assets even remotely appropriate. Their <u>only</u> financial priority should have been building their liquid savings. Both the VUL and the mutual fund were grossly

---

[29] Negative amortization of a loan balance occurs when a borrower's monthly payment is less than the interest amount. The difference is added to the principal, resulting in a increased loan balance.

unsuitable.   A competent, ethical investment professional never would have made such recommendations.

<u>Customers Gualberto and Oliva Castro</u>

At the time the Castros were meeting with Haro, Mr. Castro was a law enforcement officer for the Los Angeles County Sheriff, earning approximately $65,000 annually.   His wife, Oliva, was 30 years of age and worked in a clerical position at a hospital.

Mr. Castro testified that during their first meeting Haro recommended that he refinance his fixed-rate home mortgage, withdraw cash, and use those funds to make certain investments. Haro led Mr. Castro to believe that the terms of his new loan would include an interest rate of 1%.   In fact, Haro did not explain the basic features of the recommended loan, including the interest rate adjustments and the possibility he could incur negative amortization.

Using money he withdrew through refinancing, and on Haro's recommendation, Mr. Castro committed to an investment in a VUL issued by Western Reserve Life.   His initial premium was $3,000.   In addition, Mr. Castro purchased a VUL in two daughter's names, with a monthly commitment of $250.

These customers also purchased mutual funds with refinance money on Haro's recommendation.   Mrs. Castro invested $19,000

---

[30] Haro states on the new account form that these customers had a liquid net worth of $100,000.  He knew that to be false.  That sum represents the cash withdrawn in refinancing the Arteagas mortgage.

in a growth fund; Mr. Castro committed over $50,000 to a portfolio of growth funds.

Neither the VUL nor the mutual funds were suitable for the Castros. First, Mr. Castro already had life insurance through his employer. The insurance features of the VUL represented a totally unnecessary expense. In addition, Haro grossly misrepresented the projected investment returns from the VUL by claiming that Mr. Castro could expect a return between 10% and 12%. It is clear that Mr. Castro understood very little about what was happening to him, a situation compounded by the fact that Haro completed all the forms, including a risk assessment, without explaining anything to Mr. Castro. The mutual funds were fundamentally unsuitable because they were purchased with borrowed funds. Essentially, they were bought on margin. The significant additional risk associated with the leverage is completely inconsistent with Mr. Castro's low risk tolerance, as reflected on his Client Account Form.

Haro's recommendations to Mrs. Castro were equally unsuitable, particularly the life insurance. This customer had no demonstrable need for life insurance of any kind, nor was she in a position financially to be making investments in risky financial assets. Given her minimal liquid net worth, the appropriate advice for her would have been to accumulate sufficient liquid savings and eliminate most debt before even considering other uses for her savings.

Customers Luis and Lydia Dominguez

When the Dominguezes first met Haro, Mr. Dominguez was employed as a factory worker, and Mrs. Dominguez was a real estate agent.  Mr. Dominguez had a 401(k) worth approximately $25,000, but the couple had no liquid savings.

At his first meeting with the Dominguezes, Haro recommended that they refinance (through AFMC) out of their 15-year, fixed-rate mortgage, take cash out, pay down some other debt, and use the savings to purchase two investments: a VUL and mutual funds.  Haro told them that their monthly payment would decline by almost $1,000.  This statement was, at best, misleading because it understated the payments the Dominguezes would be making on a new loan.

Haro grossly misrepresented the terms of the loan he recommended by telling the Dominguezes that their interest rate would be 1%.  Furthermore, Haro did not explain that the principal balance on the new loan would increase if the Dominguezs made only the minimum payment.  These customers had virtually no understanding of their new loan, which closed on December 2, 2005.  At closing, and without explanation, the Dominguezes were charged $1385 by Pro Services Rendered LLC, a Haro-owned business.

Haro also recommended that the Dominguezes use funds from the refinance to invest in aggressive growth mutual funds, which he represented would earn 12% annually.

Neither recommendation (the VULs or the mutual funds) was suitable for these customers.  Haro stated incorrectly that

their investment objective was aggressive growth and their risk tolerance was high/speculative.  He also misstated the Dominguez's liquid net worth.  As is the case for other customers, Haro counted cash from the refinancing as liquid net worth.  In fact, that cash remained liquid for a very short period of time.  Haro also failed to disclose his relationship with Pro Services Rendered LLC.

The Dominguez's actual investment objective should have been to build their savings and reduce their indebtedness. They could not afford to take any investment risk.  When viewed in the context of the Dominguez's actual financial condition, Haro's recommendations exposed them to far more risk than they could tolerate.  Furthermore, any investment made with liquefied home equity is unsuitable, by definition.  The Dominguez's complete lack of understanding the recommendations makes them all the more inappropriate.

Conclusions

Business between a RR and his customer is not conducted at arm's length.  Because of the disparity in investment knowledge and experience, a broker is required to observe high standards of conduct, place his customer's interests first, and make only such investment recommendations as are suitable.  The very

nature of the relationship requires the customer to place trust and confidence in his broker.[31]

My review of Haro's recommendations to the customers described herein leads to one conclusion only: Haro systematically and deliberately abused his clients' trust by engaging in sales practices prohibited by both FINRA and WGS.

- Haro recommended to customers that they refinance their home mortgage and use withdrawn cash to make other investments.

- Haro misrepresented VULs as primarily investment vehicles.

- Haro did not ensure that his customers fully understood the products in which they were investing.

- Haro recommended life insurance to customers who had no legitimate need for such insurance or could not afford it.

- Haro did not adequately disclose to his customers the conflict of interest between himself and AFMC.

- Haro did not accurately describe his customers' investment objectives and tolerance for risk. He completed forms meant for the customer to review and complete.

---

[31] The testimony of Lydia Dominguez is a good example. "So I told him [Haro] 'We trust you. I know you're going to do something good for us.' So we did get to trust him so, therefore, that's why we did not review anything."

- Haro knowingly represented to WGS that the liquid net worth amounts stated on many customer new account forms were greatly inflated because the number included cash withdrawn from a refinancing transaction.

- Haro did not adequately explain to his customers the material facts about their new loans, particularly the adjustable interest rate features and the possibility for negative amortization.

Haro's conduct resulted in significant financial losses to those customers who followed his advice.

Finally, I note that WGS conducted its own investigation of Haro's sales practices. As a result, Haro was placed under special supervision, fined $20,000, and barred from WGS-related meetings and outside activities for a period of one year. In addition, WGS instructed him to "make whole" each of his customers who used home equity to purchase securities.[32]

Respectfully submitted,

SECURITIES LITIGATION & CONSULTING GROUP

---

[32] Deposition of Guillermo Haro; *see also* Letter from Wendy Taylor to Guillermo Haro, dated October 31, 2008.