Karen L. Martinez (Utah Bar No. 7914)
martinez@sec.gov
Thomas M. Melton (Utah Bar No. 4999)
meltont@sec.gov
Jennifer Moore (New York Bar No. 3054301)
mooreje@sec.gov
Paul Feindt (Utah Bar No. 8769)
feindtp@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
15 West South Temple, Suite 1800
Salt Lake City, Utah 84101
Telephone:     (801) 524-5796
Facsimile:     (801) 524-5262

Local Counsel:
Karen Matteson (Cal. Bar No. 102103)
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036-3648
Telephone:     (323) 965-3840
Facsimile:     (323) 965-3908

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    vs.<br><br>KEDERIO AINSWORTH, GUILLERMO HARO, JESUS GUTIERREZ, GABRIEL PAREDES and ANGEL ROMO,<br><br>    Defendants. | EDCV08-1350 VAP (OPx) |

**SUPPLEMENTAL REPORT OF EXPERT PAUL MEYER**
**DATED JANUARY 6, 2010**

Assignment

Counsel for the United States Securities and Exchange Commission (the "SEC") asked me to review deposition transcripts and certain documents relating to Guillermo Haro ("Haro") customers Santiago Ayala, Cristina Cepeda, George Robles and Pablo Saldana in order to express opinions, if any, about the suitability of Haro's investment recommendations to these customers and the appropriateness of certain sales practices Haro employed. Finally, counsel for the SEC asked me to identify and describe any patterns in Haro's conduct which should have been obvious to his supervisors. This report supplements, and should be read in conjunction with, my Expert Report dated December 11, 2009.

Materials Reviewed

For the above-referenced customers:
- WGS Client Account Forms;
- WGS Order Tickets;
- Documents relating to refinance transactions;
- Applications for VUL policies;
- Risk profile questionnaires;
- Account statements created by Western Reserve Life;
- Account statements created by various Idex mutual funds; and,
- Deposition testimony

Customer Santiago Ayala

When he met Haro, Santiago Ayala ("Ayala") was working as an equipment mechanic. His annual earnings were approximately $40,000. He had no experience investing in financial assets.

Haro met with Ayala in Ayala's home to discuss refinancing his home mortgage. Ayala's intention was to withdraw only $20,000 to $30,000 in cash. Instead, Haro convinced Ayala to take out close to $160,000 and "invest it into something else."[1] Ayala was reluctant to take on such a large loan, but Haro persisted until Ayala ultimately acceded to Haro's recommendation. He withdrew $158,506 from a refinancing that closed January 12, 2006.

Haro misled Ayala through false statements and omission of material facts. Haro did not explain the important features of the new loan, other than the existence of a prepayment penalty. Instead, Haro misleadingly told Ayala that his monthly payment would be lower than what he had been paying previously. He did not explain that the lower payment would result in negative amortization of the loan balance. Haro did not explain that the loan had an adjustable interest rate. As part of the refinancing, Ayala paid a fee of $1,385 to Haro's limited liability company, Pro Services Rendered, LLC ("Pro Services"). Haro did not disclose the conflict of interest created by his ownership of Pro Services. Haro misstated Ayala's income in order to qualify him for the loan.[2] When Ayala's loan balance began to increase he became alarmed and eventually discovered

---

[1] Deposition of Santiago Ayala ("Ayala Dep.") at p. 19.
[2] Id. at p. 35.

the true nature of the loan. Within a year, he refinanced out of the Haro loan.

Ayala opened an account with Haro at WGS on February 19, 2006. He was asked to initial various disclosures on an account opening form, even though he read English "only a little."[3] Haro did not explain what the disclosures meant.

Similarly, the Order Ticket and Disclosure Forms (for the mutual fund and VUL purchases), were completed by someone other than Ayala. Haro brought these completed forms to Ayala and asked him to initial its disclosures and sign the form without any explanation.

Without explaining the risks of investing liquefied home equity, Haro recommended that Ayala purchase VULs for himself, his daughter, Jessica, his son, Allen, and his wife, Liduvina Espino. Haro did not explain to Ayala any of the features of a VUL, including surrender charges, the nature of the underlying investments or that the VULs could decline in value.[4] These were all funded from refinance proceeds. Haro did not explain the risks of investing liquefied home equity. He told Ayala that earnings from the mutual funds[5] could be used to make subsequent payments to the VULs.

Haro's recommendations to Ayala were not suitable. All the investments were made using liquefied home equity. Haro failed to disclose important facts about the new loan or Haro's ownership of Pro Services. In reality, Ayala's financial

---

[3] Ayala Dep. at p. 39.

[4] Id. at p. 55.

[5] Haro also recommended that Ayala invest $96,000 in various equity and money market mutual funds.

objectives should have been liquidity and preservation of capital. Haro's recommendations exposed Ayala to far more risk than he could tolerate. Ayala's children had no legitimate need for life insurance. Finally, Ayala did not understand the products he was purchasing.

Customer Cristina Cepeda

Cristina Cepeda ("Cepeda"), age 54, is a food service worker for the Santa Ana (California) School District. At the time she met Haro, in August 2005, her primary occupation was caring for her elderly parents. Her net worth consisted of equity in her home and small balances in a retirement account and in a bank. Cepeda has a limited command of English and virtually no financial or investment knowledge.[6]

Haro met with Cepeda to discuss refinancing her home mortgage. He proposed a variable rate mortgage with three monthly payment options, a so-called "pick-a-pay" loan. Cepeda did not understand that if she chose to make only the minimum payment, her loan balance would increase through negative amortization. She also did not understand that the interest rate on the loan could change.

Cepeda opened a WGS account with Haro in August 2005.[7] Much of the information Haro put on her new account form was incorrect. For example, Cepeda did not have a liquid net worth of $35,000. That amount represented part of the cash

---

[6] For example, she does not understand the concept of personal net worth. Also, she thought her $20,000 mutual fund investment was going into a savings account at a credit union or a bank.

[7] On Cepeda's Client Account Form, August 13 was crossed out and August 25 substituted.

withdrawn from her refinance. She did not have an annual income of $80,000.[8] That amount erroneously included her then-husband's income; however, he was not a co-owner of the account.[9] Haro also overstated Cepeda's risk tolerance.[10]

Haro knew that Cepeda owned a life insurance policy. In spite of that, he recommended she use some of the refinance proceeds to purchase a VUL. Haro told her she would earn at least 11% annually and that the account would be worth $177,387 when she turned 65, assuming a $5,000 initial investment and $500 per month investment thereafter. Cepeda did not understand that she could lose money in a VUL.

Order tickets and disclosure forms prepared by Haro for these mutual fund and VUL purchases contained serious misstatements and omissions. The mutual fund ticket failed to disclose that the source of funds for the investment was liquefied home equity. Haro instructed Cepeda to initial each of the disclosure items on the forms. It is clear from her testimony, however, that Cepeda did not understand what she was signing. The form is in English, which she cannot read. Even when translated into Spanish, Cepeda could not comprehend these disclosures. Haro did not explain that the recommendations carried risk, nor did he discuss the

---

[8] Therefore, the stated Monthly Discretionary Income of $650 is also incorrect.

[9] Cepeda and her husband have since divorced.

[10] The form stated that her risk tolerance was "low/moderate" and her investment objectives were "growth and income." Given her modest financial condition, Haro should have identified preservation of capital as her primary objective.

additional risks of using borrowed money to make risky investments.

For several reasons Haro's recommendations to Cepeda were wholly unsuitable. Cepeda already had life insurance, which is the primary purpose of a VUL. Additionally, a VUL's risk and illiquidity were inconsistent with her actual financial needs. Cepeda understood nothing about the product. Finally, the VUL was funded with liquefied home equity.

Customer Pablo Saldana

Pablo Saldana ("Saldana") opened an account with Haro in late 2006 or early 2007. At the time, Saldana was earning $10.50 per hour working for a seafood distribution company. His annual earnings had never exceeded $30,000.[11] Saldana had no retirement savings; however, he did have equity in his home. His liquid net worth consisted of balances in two bank accounts. He had almost no formal education and no experience investing in financial assets. Saldana's primary objectives should have been liquidity and preservation of capital.

Haro completed and signed a Client Account Form purporting to describe Saldana's financial condition. The form could never have been used as the basis upon which to make investment recommendations, however, because it lacked critical information, such as investment objectives, risk tolerance, and income. Haro incorrectly (and misleadingly) represented Saldana's liquid net worth as $240,000, an amount which included

---

[11] Saldana is now retired and depends primarily on Social Security and a small amount of net rental income.

$205,000 withdrawn in the refinancing of Saldana's residence.[12] Haro's representation of Saldana's liquid net worth grossly distorted his true financial condition because it failed to include the offsetting liability created by the new mortgage.

When he met with Saldana, Haro recommended the purchase of an equity mutual fund offered by IDEX, a Transamerica company. It is clear from Saldana's testimony that he had no understanding of mutual funds or this recommendation. He stated Haro told him the fund had no risk and would return between 10% and 12% annually. Both representations, of course, were utterly false. Saldana invested $15,000 in this fund.

Haro also recommended a VUL, which he described as an investment that "could earn good money."[13] In so doing, Haro misrepresented the primary purpose of a VUL: life insurance.

On the Order Ticket & Disclosure Form prepared for this purchase, Haro stated that the source of investment funds was "bank accounts." He also instructed Saldana to initial item #10 on the form, attesting that the money was not coming from the proceeds of a mortgage refinancing. Haro knew those representations were false.

Saldana had no comprehension of what Haro was telling him about these investments. Saldana's limited ability to read the forms, printed in English, further complicated his understanding of the investment products Haro offered and sold to him. In

---

[12] On October 20, 2006, Saldana refinanced the mortgage on his residence, withdrawing approximately $206,859.27 in cash. Haro was not involved in the transaction.

[13] Deposition of Pablo Saldana ("Saldana Dep.") at p. 29. During the application process Saldana became suspicious and cancelled his application. WRL returned the full amount of his purchase.

fact, Saldana thought Haro and his associates worked for a bank and that he would be earning "interest" on his equity investments.

Haro's recommendations to Saldana were exceedingly unsuitable. First, a customer's inability to understand an investment recommendation makes that investment unsuitable. However, even if Saldana had understood them, Haro's recommendations were still unsuitable. Saldana was not in a position to put at risk the cash from his refinancing. Additionally, neither the VUL nor equity mutual funds were consistent with Saldana's actual financial objectives.[14] Haro's recommendations exposed Saldana to risks from which he could never recover if he were to lose the money.

Customer George Robles

George Robles ("Robles") is a photoprogrammetrist employed by the Riverside County (California) Flood Control and Water Conservation District, where he earns approximately $70,000 per year. When Robles first met with WFG representative Jessica Rhubottom ("Rhubottom") in April 2005, he was 48 years old and divorced. He held several financial assets, including a retirement account ($10,000), certificates of deposit ($26,000) and an annuity originally funded with $50,000. He had no real knowledge or experience investing in stocks.

---

[14] Because Saldana had very little true liquid net worth, building cash reserves should have been his primary financial objective.

Robles told Rhubottom he was interested in buying life insurance for the benefit of his sons. She recommended a VUL, a product with which Robles was completely unfamiliar, even though he had worked in the insurance industry previously. She did not explain the basic features of a VUL such, as the way the money is invested, the purpose of sub-accounts, exchange privileges, etc. Robles purchased a VUL for himself on February 16, 2005.

Subsequently, another WFG representative, Geraldo Martinez ("Martinez") met with Robles and recommended that he refinance his home mortgage, withdraw cash and invest it in other financial assets whose value would increase "quicker."[15] He was told that Haro, whom Robles had never met, would handle the investing. Rhubottom and Martinez arranged for the refinancing through Ainsworth Financial Mortgage Corp. ("AFMC") without disclosing to Robles the relationship between AFMC, WFG, and WGS. He was aware that the loan had a prepayment penalty and that negative amortization would result from making the minimum payment. Robles withdrew $86,725 in cash from the refinance.

In October 2005, Martinez arranged for Robles to meet with Haro to discuss investment of the refinance proceeds. Robles's overall objective was to make long term growth investments that ultimately would benefit his sons, George, Jr. and Ryan, and his grandson, Damien. Haro's first recommendation was a VUL and mutual funds[16] for Damien. Robles

---

[15] Deposition of George Robles ("Robles Dep.") at p.30.
[16] Haro also recommended a money market fund.

- 10 -

understood that some of the money would be invested in the stock market, which carried risk, but he did not know anything about how mutual funds work.

Haro also recommended VULs for Robles's sons. On both VUL applications (which were not completed by Robles) Haro instructed Robles to initial item #10, which stated that the policies were not being funded from the proceeds of a mortgage transaction. Haro knew that statement was false.

On Haro's recommendation, Robles also invested $50,000 in the Idex Moderate Growth Portfolio and $22,000 in a money market fund. Both investments were funded from refinance proceeds.[17] Robles did not complete the application forms. They were brought to him already filled out, and Robles testified that during their meeting Haro was impatient and wanted the papers signed quickly.

These recommendations were not suitable. They were purchased using money from a loan refinancing, which adds leverage (and therefore additional risk) to any investment. Given Robles's financial liabilities, such risk was completely inappropriate. Robles had no way to repay these borrowed funds except by selling assets (most likely the assets purchased with the liquefied home equity) at potentially distressed prices. The VULs were particularly unsuitable for Robles's sons, neither of whom had a legitimate need for life insurance, the primary purpose of a VUL.

---

[17] Robles Dep. at p. 68.

Conclusions

My original report and this supplemental report examine in detail the interactions between Haro and 13 customer households. I observe that Haro systematically employed certain sales practices with his customers:

- Haro used his superior knowledge of investing and the financial markets to win the trust of his customers;
- Haro convinced his customers that his recommendations would assure them a good financial future;
- Haro recognized that his customers' major source of equity was their homes;
- Haro recommended that his customers refinance their home mortgages, withdraw the maximum amount of cash available, and invest that cash in products he was selling;
- Haro did not explain the basic facts about the loans he was recommending;
- Haro did not explain the content of the forms and disclosures his customers signed. His customers did not understand these disclosures;
- Haro did not adequately disclose all the conflicts of interest between his customers and AFMC or Pro Services;
- Haro recommended a VUL to every customer, regardless of its suitability;
- Haro recommended equity mutual funds to most customers, in spite of the fact that they were far too risky for these customers;

- Haro misled his customers by telling them they could fund periodic payments into a VUL from mortgage payment reductions (realized from refinancing) or mutual fund earnings; and,

- Haro made it very difficult for customers to contact him after their investments were made.

The most fundamental responsibility of a registered representative is to "observe high standards of commercial honor and just and equitable principles of trade" when dealing with customers.[18]  Haro's business practices fell far short of that standard.  His sales process was carefully designed and consistently implemented in a manner that maximized his own earnings, at the expense of customers who trusted him.  His conduct seriously, repeatedly, and deliberately violated WGS's policies, FINRA's rules, and acceptable industry practice.

Respectfully submitted,

*Paul F. Meyer*

SECURITIES LITIGATION & CONSULTING GROUP

JANUARY 6, 2009

---

[18] FINRA Rule 2010 (since changed to FINRA Rule 2110).