Karen L. Martinez (Utah Bar No. 7914)
martinez@sec.gov
Thomas M. Melton (Utah Bar No. 4999)
meltont@sec.gov
Jennifer Moore (New York Bar No. 3054301)
mooreje@sec.gov
Paul Feindt (Utah Bar No. 8769)
feindtp@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
15 West South Temple, Suite 1800
Salt Lake City, Utah 84101
Telephone:    (801) 524-5796
Facsimile:    (801) 524-5262

Local Counsel:
Karen Matteson (Cal. Bar No. 102103)
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036-3648
Telephone:    (323) 965-3840
Facsimile:    (323) 965-3908

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>vs.<br><br>KEDERIO AINSWORTH, GUILLERMO HARO, JESUS GUTIERREZ, GABRIEL PAREDES and ANGEL ROMO,<br>    Defendants. | EDCV08-1350 VAP (OPx) |

**SUPPLEMENTAL EXPERT REPORT,**
**CRAIG J. MCCANN, PH.D., CFA**
**JANUARY 5, 2010**

## I. Qualifications and remuneration

My qualifications and remuneration are described in an expert report dated December 11, 2009 that I previously filed in this matter. *See* Docket #39.

## II. Materials reviewed

In preparing this report, I have reviewed the following information:

a. Deposition of Santiago Ayala, December 14, 2009 with Exhibits;
b. Deposition of Pablo Saldana, December 16, 2009 with Exhibits;
c. Deposition of George Robles, December 18, 2009 with Exhibits; and
d. Deposition of Cristina Cepeda, December 18, 2009 with Exhibits.

## III. Assignment

I have been asked by counsel for the Commission to review the above-referenced depositions taken since my initial report and supplement my opinions if necessary based on this new information.

## IV. Supplemental opinions

The recent depositions provide additional examples of Defendant Haro's abusive practices. In the interest of brevity, my comments herein will use the Santiago Ayala transactions to illustrate the substantial harm caused by Defendant Haro.

Prior to meeting Mr. Haro, Mr. Ayala and his wife, Liduvina Espino had a $120,000 mortgage against a home worth $285,000, no additional debt and perhaps $35,000 in two bank accounts.[1] Mr. Ayala and Ms. Espino were in an admirable financial situation with a $285,000 home with only $90,000 in net debt. They could have weathered substantial – even complete – declines in the value of their home. Their monthly principal and interest mortgage payment of $1,100 was

---

[1] These numbers are approximate but capture the basic economics of the change in Mr. Ayala and Ms. Espino's financial situation as a result of Defendant Haro's actions.

2

consistent with their incomes. With their equity, liquid assets and absence of debt, they could have also weathered prolonged periods without income.

After meeting Mr. Haro, Mr. Ayala and his wife had fully mortgaged their primary residence, purchased two heavily mortgaged rental properties in Texas and made large investments in high-cost VULs. A portion of their previous equity had been dissipated in fees associated with the cash-out refinancing, the purchase and financing of the two Texas homes and the purchase of the VULs. The gross assets now supported by the diminished equity grew dramatically with the addition of the two rental properties and the VULs.

The cash-out refinancing used to fund leveraged investments in additional real estate and the purchase of VULs put Mr. and Mrs. Santiago in a precarious position. The principal and interest payments on a $285,000 traditional mortgage were more than double Mr. Ayala and Ms. Espino's previous mortgage payment and could not have been made given their total monthly income. The feasibility of the refinanced mortgage was accomplished by making it a negative amortizing loan in which Mr. Ayala and Ms. Espino did not pay the full interest assessed each month. Eventually, this less-than-interest-only mortgage would have to conform to a traditional principal and interest structure and then even the slightest disruption in Mr. Ayala and Ms. Espino's income would jeopardize their home.

The short-term rental payments on the Texas homes just covered the associated mortgage payments. Any prolonged disruption in rental income would become a negative net cash flow crisis given Mr. Ayala and Ms. Espino's modest income.

The VULs purchased were high-cost insurance bundled with high-cost securities investments. Mr. Ayala and Ms. Espino had neither insurance nor securities prior to meeting Mr. Haro. With only modest income and without other

assets, it is not surprising that Mr. Ayala and Ms. Espino, consistent with the research I quoted in my previous report, quickly lapsed the VULs.

## V. Conclusions

The additional depositions I have reviewed confirm my previous recognition of Defendant Haro's pattern of abuse of unsophisticated homeowners for his own personal benefit.

By way of example, Defendant Haro recommended a course of conduct that predictably transformed Mr. Ayala and Ms. Espino's admirable low-risk financial situation into a highly leveraged investment in three properties including two rental properties in Texas and securities investments. In addition to the price risk this increased leverage created, the cash flow from the rental properties and securities investments were not enough to cover the true costs of the refinanced mortgage plus the mortgage on the two rental properties plus the insurance commitments.

As I concluded previously, Defendant Haro's conduct in selling VULs to low income families through leveraging up their modest homes is perhaps the most egregious abuse of investors I have encountered as a researcher and consultant focused on retail investments for the past 20 years.

*[signature]*
Craig J. McCann
Fairfax, VA